Charles Maisel and Another, Copartners, Doing Business as Charles Maisel & Co., Plaintiffs, *v.* Morris Sigman, as President of the International Ladies' Garment Workers' Union, et al., Defendants.

Supreme Court, New York Special Term, June 5, 1924.

Labor unions — strikes — action to set aside contract, to limit workers' right to strike for enforcement of said contract, and to recover damages caused by strike — agreement fixing hours of labor, rate of wages and other working conditions stipulated against employment of additional submanufacturers and contractors without consent of union — employers refused to pay award made against them for breach of agreement by arbitrator named by them under clause in agreement providing for arbitration of any dispute between parties — employers' claim agreement was obtained by duress — workers may combine, and strike, so long as they do not violate express statute or contract — burden not on workers to justify strike — agreement not procured by duress — employer and union may voluntarily enter into agreement preventing employer from doing work for another employer against whom strike is pending — clause in agreement providing for equal distribution of work and forbidding discharge of employees or submanufacturers during term of agreement without cause not contrary to law — agreement neither creates monopoly in restraint of trade in production of cloaks and suits within meaning of General Business Law, § 340, nor is it void for lack of mutuality — labor unions exempt from prohibition against operation of conspiracies to create monopolies under Penal Law, § 582 — agreement valid as contract of employment and not unilateral — provision fixing amount of liquidated damages valid and binding on employers — complaint dismissed.

In an action to set aside, on the ground of duress and illegality, a contract, between the plaintiffs as employers and the defendant labor union, acting as agents for the workers, to limit the defendants' right to strike for the enforcement of the contract and for damages caused by a strike, it appears that the plaintiffs, manufacturing jobbers of ladies' coats, after labor trouble, effected an agreement with the defendants which after fixing the hours of labor and wage rates, undertook to regulate all phases of the working conditions between the parties as such employees and employers; that the agreement also stipulated against the plaintiffs' employment of additional submanufacturers and contractors without the consent of the union; and that subsequently the workers declared a strike upon the refusal of the employers to pay the award of $3,000, stipulated in the agreement as damages in case of a violation of the agreement, made against them by an arbitrator named by them under a clause in the agreement providing for the arbitration of any disputes between the parties.

*Held*, that the right of workingmen to combine and to strike and to secure the furtherance of their common interests in every way is unlimited so long as it is not within the prohibition of some statute and does not involve the commission of illegal acts. Moreover, an action of a combination of workers is lawful so long as the combination merely is taking measures to secure its own legitimate advantage or economic advancement, although harm may incidentally result to the employer.

The agreement was not procured by duress since the evidence indicates negotiations and several conferences regarding the terms of the proposed agreement with the resultant amendments and that the plaintiffs accepted and acted under the agreement during a whole season before repudiating it. The law requires a prompt repudiation of an agreement alleged to have been induced by duress.

An employer and a union of workers may voluntarily enter into an agreement to prevent an employer from doing work for another employer against whom a strike is pending, or from giving work to such an employer, without violating the statute against monopolies.

The provisions of the agreement as to the equal distribution of work and forbidding the discharge of employees or submanufacturers without cause, during the employment term, is not contrary to law since they are part of the conditions imposed by the workmen in consideration of entering the plaintiffs' employment.

The agreement does not tend to create a monopoly in restraint of trade in the production of cloaks and suits within the meaning of section 340 of the General Business Law as the evidence indicates that no agreement with the plaintiff can affect competition among the 3,000 other cloak manufacturers in New York city. Moreover, section 582 of the Penal Law specifically exempts labor unions from the prohibition against the operation of conspiracies to create a monopoly.

Neither is the agreement void for lack of mutuality but rather it is valid as a bilateral agreement of employment for its provisions imply equal obligations on the part of the contracting parties.

The provision of the agreement fixing $3,000 as the amount of liquidated damages in the event of a breach of the agreement by the plaintiff does not create a new liability on the part of the employer, but liquidates a liability implied by law and is valid and binding upon them under the circumstances.

Plaintiffs' complaint should be dismissed since it fails to state a cause of action.

ACTION to set aside contract to limit defendants' right to strike, for the enforcement of the said contract and for damages.

*Snitkin & Goodman,* for the plaintiffs.

*Morris Hillquit,* for the defendants.

BURR, J.  This is an action to set aside a contract made between the plaintiffs and the defendant Joint Board of Cloak, Skirt, Dress and Reefer Makers' Union, to limit the defendants' right to strike, for the enforcement of the said contract, and to recover damages alleged to have been sustained by the plaintiffs by reason of such strike.  The complaint alleges that the plaintiffs are manufacturing jobbers, doing business at No. 500 Seventh avenue, in the city and state of New York, and that their firm, which has been established for thirteen years, is widely known throughout the United States as a jobber and wholesaler of ladies' coats, and that they have been selling largely to jobbers, mail order houses, department stores, and specialty stores throughout the United States, doing an average yearly business of about $2,000,000 for the last five or six years; that up to November 1, 1923, plaintiffs conducted a manufacturing establishment at their

premises in conjunction with the jobbing business; that in the natural course of the plaintiffs' business they entered into contracts with various manufacturers to make up quantities of merchandise for the needs of their trade, and that they also purchased large quantities of made-up garments; that the plaintiffs' firm has no control over the shops of the various manufacturers who make up their merchandise, their management and conduct; that on July 5, 1923, a certain paper writing purporting to be a contract was signed between the plaintiffs and the defendants; that the plaintiffs desire to have this paper writing set aside and declared null and void, upon the grounds that it was forced upon them by duress; that it is unilateral; that the said paper writing is but a detail in a conspiracy entered into by the defendants for the purpose of destroying plaintiffs' firm; that the defendants have violated the terms of the said paper writing and that it is an illegal and void instrument; that in January, 1923, after the plaintiffs had suffered a severe deficit in their business, and they found it impossible to exist unless the inside factory was reduced, and after they acquainted the defendants with the situation, advising them that it would be necessary to have the merchandise made up by other manufacturers under contract with the plaintiffs, the defendants stated that they would not permit a reorganization of the plaintiffs' shop under any circumstances; that in April, 1923, a strike was declared because the plaintiffs wanted to reorganize their plant, their place of business was picketed and their employees were intimidated and threatened and the plaintiffs were prevented from doing any business for the months of April, May and June, and that the defendants by a boycott prevented all manufacturers from doing business with the plaintiffs' firm, and made it impossible for the plaintiff to obtain merchandise to fill its orders, as a result of which plaintiffs suffered heavy losses; that by virtue of intimidation and threats of absolute business ruin and annihilation, as well as boycotts and strikes, the plaintiffs were coerced into signing the alleged agreement of July 5, 1923; that the contract was onerous, unworkmanlike and impossible of performance, and that it was a link to a conspiracy to compel the plaintiffs to accede to the dictatorship of the union, whose object it was to restrain the plaintiffs in the natural operation of their business, knowing full well that it would mean that the plaintiffs' business would be ruined; that a series of unlawful strikes supervened with that object in view, and a reign of terror was imposed upon the plaintiffs' firm, as well as upon the persons doing business with them, who were prevented and intimidated from continuing business relations with the plaintiffs' firm.    The answer is in effect a general denial.

The facts, as revealed by the evidence in the case, are substantially as follows:

The defendant International Ladies' Garment Workers' Union is a national labor union, whose members, about 150,000 in number, are engaged in the various branches of the women's wear industry. The organization consists of about 200 local unions, located throughout the country. It is affiliated with and is part of the American Federation of Labor, and its avowed objects are to improve the material conditions of its members by securing for them better wages, shorter working hours, sanitary shop conditions, and humane treatment on the part of the employers. The defendant Joint Board of Cloak, Skirt, Dress and Reefer Makers' Union is a subordinate organization of the International, and a delegated body composed of representatives of all local unions in the city of New York whose members are engaged in the cloak, suit and dress industry. The total number of such members is about 70,000, of whom between 45,000 and 50,000 work in the cloak industry alone. These constitute about ninety-five per cent of the total number of cloak workers in the city of New York. Prior to the organization of the International the workers in the garment makers' industries were compelled to work for what they claimed to be unreasonably long hours for inadequate pay; the shops and factories in which they were employed were often conducted under conditions detrimental to the health and morals of the workers, and the system under which they were employed became known as the " sweat shop " system in the clothing industry. These conditions continued unabated until 1910, when the cloak workers in the city of New York went on strike for better conditions. The strike lasted about twelve weeks and enlisted the interest and active assistance of a large number of public-spirited citizens in an effort to adjust and settle the dispute between the employers and the workingmen on a fair and mutually advantageous basis. Through the good offices of these citizens conferences were finally arranged between the striking workers, represented by the Cloak Makers' Union, who at that time had formed an organization known as the Cloak, Suit and Skirt Manufacturers' Protective Association. These conferences finally resulted in an agreement between the parties, styled " Perpetual Protocol of Peace in the Cloak and Suit Industry." The agreement was renewed from time to time between the association and the union, and as modified is still in force between the parties. The said agreement, which was last made on the 29th day of May, 1919, and modified by a supplemental agreement dated July 17, 1922, is executed by the association and the union, the former obligating itself for its

members " that they will live up in good faith to all the provisions of the agreement " and the latter " contracting herein for and in behalf of the said union for and in behalf of the members thereof now employed and thereafter to be employed by the members of the association." The agreement fixes the hours of labor, rates of wages and other working conditions. It provides that the contractors employed by members of the association will operate at least ten machines and maintain the established standards of wages and work hours. Members of the association guarantee the payment of wages by their contractors.

The plaintiffs were members of the Cloak, Suit and Skirt Manufacturers' Protective Association for about seven years, from 1916 until the month of April, 1923. By reason of such membership they were parties to the said collective agreement, and operated under the terms of the same throughout the period of seven years of their membership. Some time in the early part of 1923 the plaintiffs concluded to reorganize their business, by reducing the number of their employees from about three hundred and fifty to sixty-five or seventy, discharging the remaining employees, and having their work done in " outside " shops by submanufacturers and contractors. This plan, it was claimed by the union, did not come within the term of " a reorganization in good faith " contemplated by the collective agreement between the parties, which defined such reorganization as one " necessitated by a permanent curtailment of his [the employer's] business or a fundamental change in the character of his business." The union, therefore, refused its consent to such " reorganization," and the plaintiffs thereupon voluntarily resigned from the Cloak, Suit and Skirt Manufacturers' Protective Association, for the express purpose of relieving themselves from the obligations of the collective agreement and obtaining a free hand to discharge the majority of their workers in accordance with their plans. Thereafter the plaintiffs attempted to discontinue manufacturing in their own " inside " shop altogether, and to have their work done by submanufacturers and contractors. The plaintiffs' employees then went on strike against this proposed reorganization, which strike lasted from fourteen to fifteen weeks. After the strike had been in progress for several weeks, negotiations for settlement were opened between the plaintiffs and their employees. The initiating of such negotiations came while Charles Maisel, the senior partner of Maisel & Co., the plaintiffs herein, was sick, and several of the older employees visited him at his home. Benjamin Small, the other member of the firm, was traveling abroad at the time. The controversy between the parties was informally discussed at that time

and more formal conferences between Mr. Maisel and representatives of his employees and of the union were arranged for. All told, about eight or nine of such conferences were held. They all took place in the plaintiffs' place of business. On the part of the plaintiffs, Charles Maisel was present at all such conferences, as was Max W. Rosenbaum, an employee of the plaintiffs. Benjamin Small, the other member of the firm, took part in only the last three conferences after his return from Europe. On the part of the defendant union, Jacob Rubin, "manager of the protective division" of the joint board, attended all meetings. Israel Feinberg, the manager of the board, attended most, though not all, of such meetings. Other union officials were called in from time to time for the discussion of special points, and a delegation of the plaintiffs' employees, consisting of four or five members, was always present.

In the course of these conferences the points at issue between the parties were thoroughly discussed. On the main question -- i. e., the question of reorganization of plaintiffs' establishment — the union conceded the point to the plaintiffs at the outset. It appeared at the first conference that the plaintiffs had sublet a portion of their loft and thus materially curtailed the physical working capacity of their factory. The main dispute thereafter turned upon the extent of the plaintiffs' curtailment of their inside working force. It was the effort of the union to secure as large a number of machine operators as possible under the circumstances, for the alleged reason that the operators formed the basis and determined the extent of the entire working force, since each operator requires a corresponding complement of workers in other branches, such as pressers, finishers, etc. On the other hand, the union sought to reduce the number of cutters, for the alleged reason that the number of cutters employed in an "inside" factory largely determines the latter's capacity to furnish work to "contractors," as distinguished from "submanufacturers." A contractor is one who puts together the garments from pieces furnished to him by the manufacturer in cut form; a submanufacturer cuts the goods in his own establishment and does the whole work. A submanufacturer, in the eyes of the union, is an employer of a somewhat higher degree of standing and responsibility than a contractor, and the union prefers to deal with that type of an employer rather than with a smaller and less responsible contractor. The first discussion was upon the two points above mentioned. The plaintiffs proposed to employ twelve cutters, while the union representatives would not consent to more than four. On the other hand, the plaintiffs desired to employ only fourteen operators, while their employees

insisted on a considerably larger number. The dispute was finally compromised on the basis of seven cutters and twenty-five operators. Another difference arose over the number of garments which the plaintiffs should be entitled to send out weekly in cut form to submanufacturers other than those agreed upon between the parties. The plaintiffs desired the right to send out 1,000 of such garments, the union representatives proposed to limit it to 400, and the parties finally agreed upon 600 as a compromise.

Having thus settled the main points in dispute, the union prepared a draft of a proposed agreement and submitted the same to the plaintiffs. At this time Mr. Small had arrived and assumed an active part in the negotiations. He criticized the proposed agreement, principally on the ground that it did not provide for arbitration of disputes, and also because it contained a requirement for the execution of a bond on the part of the plaintiffs conditioned upon their faithful performance of the agreement. The discussion of these points occupied the parties in the last three conferences, in the course of which the union agreed to insert a clause for arbitration, as requested by the plaintiffs, and to waive the demand of a bond, substituting instead of the latter a provision liquidating the union's damages for a violation of the agreement on the part of the plaintiffs at the sum of $3,000. The agreement signed between the parties after the said conferences contains all the concessions on the part of the union above mentioned. After the execution of the agreement the plaintiffs resumed work with union employees and continued operating under the terms of the said agreement until some time in the month of October, 1923. During that period several disputes arose between the parties, growing out of admitted violations of the agreement on the part of the plaintiffs. These disputes arose principally over the plaintiffs' failure to inform the union of the submanufacturers and contractors employed by them in addition to those stipulated in the contract and to secure the union's approval of such employment. When the union discovered the alleged violations, it requested an examination of the plaintiffs' books for the purpose of ascertaining the exact number of submanufacturers and contractors employed by plaintiffs and their names and addresses, by virtue of the provisions of the 7th clause of the agreement between the parties. The examination disclosed that the plaintiffs employed eighteen submanufacturers, instead of the stipulated five, and that at least six of them conducted non-union shops. The union thereupon informed the plaintiffs in writing of the facts and requested plaintiffs to discontinue violating the said agreement and to pay it the liquidated damages of $3,000 provided for in the agreement. The plaintiffs in writing

agreed to the first request, but asked for arbitration on the question of the damage. In response to the latter request the union submitted to the plaintiffs a list of persons from time to time acting as umpires in arbitrations between the union and the association of employers, and from among those the plaintiffs selected one Arthur D. Wolf, vice-president of the Chatham and Phenix National Bank. Mr. Wolf, after an investigation which included an independent examination of the plaintiffs' books through an accountant of Mr. Wolf's own choice, found and decided that the plaintiffs had employed more than twelve manufacturers outside of those stipulated in the agreement, several of them not being under union control, and that none of such additional shops had been submitted for the union's approval or sanction. His award concluded as follows: " I therefore find for the union and for the amount of damage as mutually agreed upon." The award was communicated to the plaintiffs, but the latter refused to comply with the same, in consequence of which a new strike of their employees resulted. It is this strike which forms the basis of the present action.

At the conclusion of the plaintiffs' testimony the parties hereto stipulated in open court as follows: " It is hereby stipulated that if the court finds upon the evidence that the agreement of July 5, 1923, made between the plaintiffs herein and the defendant union, was procured by duress and coercion on the part of the defendant, or that it is invalid in law, or both, a decree may be entered herein making the temporary injunction permanent. The question of plaintiffs' right to recover damages is not in any way affected by this stipulation."

On the other hand, plaintiffs' attorney conceded that if the agreement sought to be set aside herein is found to be valid the plaintiffs have no standing in this court. The sole question before the court, therefore, is whether the agreement between the parties is valid. If it is, the complaint must be dismissed; if it is not, the temporary injunction herein must be made permanent.

The plaintiffs' objections to the validity of the agreement are based on two main contentions: (1) That the same was procured by duress; (2) that the provisions of the same render it void on the ground that it violates the anti-monopoly statute and the Penal Law of this state, that it is against public policy, and that it lacks mutuality. It is plain from the evidence in the case that plaintiffs, at the time of the proposed reorganization of their business, lacked but one thing to carry it through. They lacked the necessary labor. Their workmen had refused to work under

46

the proposed plan of reorganization and had gone on strike. Lacking the labor, plaintiffs sought it at the only source from which it was procurable, from the defendant union, of which all their workmen were members. They entered into negotiations with the union representing their workmen in order to secure the labor of the workmen they required. The defendant union, on behalf of such workmen, imposed as a condition therefor terms and conditions in favor of the workmen against which plaintiffs rebelled and protested, as harsh, unreasonable and unworkable. Finding, however, that all protests were in vain, and realizing the absolute necessity of being supplied with workmen if they were to continue in business, after many conferences and after concessions on both sides, plaintiffs, still protesting against the harsh terms and conditions imposed, finally consented to and did sign the agreement in suit, influenced thereto, they claim, and it may be assumed, by the threats of the representatives of the workmen, the defendant union, to the effect that plaintiffs would never obtain the labor they sought from the union unless they complied with the terms and conditions contained in the agreement. As a result of this agreement the plaintiffs achieved the purposes they had in mind, viz., to end the then pending strike, to radically reorganize their business, and to secure the labor of the workmen required to carry it on. Defendants denied making any threats. In substance, the threats alleged amounted to no more than a statement on the part of the plaintiffs' employees and the union representing them that they would not resume work for the plaintiffs, except upon such terms as they chose to demand.

Under the laws of this state, as interpreted by our highest court, workingmen are at liberty to withhold or to give their labor upon such terms as to them seem proper, so long as they do not violate an express contract or statute, and so long as their primary object is not the gratification of personal malice. Subject to this qualification, the right of workers to combine and to strike is unlimited, and whenever such strike is declared the workers are not called upon to justify the same upon the ground that the object of such strike falls within any particular category of the permissible causes. It devolves upon those who attack the validity of such strike to prove that it comes within an express exception of the general right of workers to strike. The reasons advanced by the workers may seem inadequate to others, but if it seems to be in their interest as members of an organization to refuse longer to work it is their legal right to stop. The reason may no more be demanded as a right of the organization than of an individual, but if they elect to state the reason their right to stop work is not cut off because

the reason seems inadequate or selfish to the employer or to organized society.

They are free to secure the furtherance of their common interests in every way which is not within the prohibition of some statute, or which does not involve the commission of illegal acts. See *National Protective Association* v. *Cumming*, 170 N. Y. 315, 321. To-day it is generally recognized in this state and in most of the other states that an action of a combination of workers is lawful so long as the combination is merely taking measures to secure its own legitimate advantage or economic advancement, although harm may incidentally result to the employer. *Bossert* v. *Dhuy*, 221 N. Y. 342; *Allis-Chalmers Co.* v. *Iron Moulders' Union, No. 125*, (C. C.) 150 Fed. Rep. 155, 171. See, also, 16 R. C. L. 434; 12 C. J. 570.

A threat to do that which a party has a legal right to do does not constitute duress, so as to invalidate the contract. *Dunham* v. *Griswold*, 100 N. Y. 224. The evidence shows negotiations and numerous conferences between the parties regarding the terms of the proposed agreement, with resultant amendments and concessions to plaintiffs, before it was actually signed, clearly indicating that plaintiffs, at the time of the execution of the agreement, were not deprived of their free will. Furthermore, plaintiffs accepted and acted under the agreement during a whole season. They subsequently repudiated it and refused to abide by its terms. They refused to pay the award made against them for breach of the agreement by the arbitrator selected by themselves under the clause of the agreement which provided for arbitration of any dispute arising between the parties regarding the carrying out of the terms of the agreement.

The law requires promptness in repudiating an agreement alleged to have been induced by duress. A contract obtained by duress is not ordinarily void, but merely voidable, and may be subsequently ratified and confirmed, and the party claiming to have been constrained by afterwards voluntarily acting upon it thereby affirms its validity and loses the right to avoid it. *Oregon Pacific R. Co.* v. *Forrest*, 128 N. Y. 83. Plaintiffs have failed to establish their right to relief on the ground of duress in the making and execution of the said agreement.

It remains to consider the claim of plaintiffs that the agreement is void and illegal, as being in restraint of trade, and in violation of the Penal Law of this state and of the United States, and as against public policy. The main features of the agreement may be summed up as follows:

The plaintiffs, who had prior to the making of this agreement

employed about 350 workers on their own premises, are allowed
to reorganize their business and to produce the smaller portion
of their merchandise in their own establishment, and the larger
portion thereof in outside shops, on condition that their inside
shop and their outside shops be treated as one establishment,
operated by the plaintiffs for the purposes of the said agreement,
and that the employees in all such establishments be treated alike.
To carry out this principle the agreement provides that the
plaintiffs employ in their inside factory not less than a total of
62 workers and that they limit their outside work to five sub-
manufacturers, to be agreed upon between them and the union.
The inside shop and the submanufacturers' shops thus agreed
upon must be fully and equally supplied with work before additional
submanufacturers are employed; none of the six shops is to be
discontinued during the term of the agreement, nor is the number
of workers in each to be reduced except for good cause; in slow
seasons all available work is to be divided as equally as possible
among the six shops and within each of them among all of the
workers.   When all such six shops are supplied with work to their
full capacity, and their total output is insufficient to meet the
requirements of the plaintiffs, the latter may employ as many
additional submanufacturers as their business calls for, but in the
selection of such additional submanufacturers the consent of the
union must be obtained.   The agreement also establishes a mini-
mum wage scale, the hours of labor, and other working conditions.
The union seeks as far as possible to equalize the conditions of
the workers discharged by the plaintiffs and those retained by
them, and the various restrictions imposed upon the plaintiffs
with respect to the number of submanufacturers to be employed
by them, the duty placed upon them to supply all such submanu-
facturers with work before engaging new ones, the provision for
equal division of the available work in slow seasons, the guaranties
assumed by the plaintiffs for the maintenance of union standards
by the submanufacturers, are all part of the general plan of placing
all employees of the plaintiffs working for them directly or indirectly
in approximately the same position.

In limiting the number of submanufacturers or contractors to
be employed by the plaintiffs, the union is, moreover, guided by
another motive, which is explained in detail by the witness Morris
Sigman, president of the International Ladies' Garment Workers'
Union.   According to the testimony of this witness, the hardships
of the workers in the earlier days of the industry under the so-called
" sweat shop system " were primarily traceable to the fact that the
industry was in the hands of an exclusive number of small and

irresponsible contractors, operating in unsanitary shops, without adequate protection, and without any check or control on the part of the union. This condition was largely abolished in 1910, and the production of cloaks and suits passed from the hands of irresponsible contractors to those of the inside manufacturers. Within the last few years a tendency has manifested itself in the industry towards a return to old conditions. This was brought about very largely by such systems of " reorganization " as plaintiffs have undertaken; *i. e.*, curtailing the inside shops and turning the work over to submanufacturers or contractors, both types of the latter employers operating without capital and working upon material furnished by the union manufacturers or " jobbers." Owing to this tendency the number of submanufacturers and contractors has greatly increased within the last two years, so that to-day the cloak industry in the city of New York, giving employment to about 45,000 workers, is represented by not less than 3,000 manufacturing establishments; *i. e.*, at the average rate of fifteen employees to the establishment. A large number of such establishments employ considerably below the average number. These small shops are as a rule operated by persons without capital, responsibility or stability. Their industrial existence often depends upon their ability to drive their employees to unreasonably hard work and to cut their wages. This tendency to revive recontracting or " sweatshop system " in the industry has become very alarming, and defendants admit they are in consequence attempting to check the same, in the interest of the preservation of the industry and of the standard of life of the workers engaged in it. It is, therefore, conceded to be the general policy of the union to check the growth of submanufacturers and contractors within reasonable limits, and it is further conceded that the agreement between the parties to a certain extent reflects such policy.

Upon the trial plaintiffs took particular exception to the provisions of the 4th clause, which provides that no submanufacturer shall be discharged during the continuance of the agreement — *i. e.*, until June 1, 1924 — except for good cause and upon the written consent of the union. This provision is no more stringent than a provision contained in any ordinary agreement of employment by which an employer undertakes to give work to an employee for a stated period of time. They also assailed that portion of the 6th paragraph which provides the plaintiff shall not, during the time of the agreement, " manufacture, produce, purchase, or secure goods for the purpose of its business in any other manner, through any agency, or from any source other than herein provided." This clause must be read in connection with the entire agreement. The

plaintiffs are not dealers in cloaks and suits, but manufacturers. They originate the style, take orders, and produce the commodities directly in their own establishment or indirectly through contractors or submanufacturers. In the latter case they deliver the material uncut to the submanufacturers at a certain price, and take it back in finished form at another price, the difference between the two constituting their cost of production. This mode of dealing between the manufacturer or " jobber " and the submanufacturer has given rise to the fiction of a sale and purchase, and the above clause was admittedly designed by the union to meet that fiction. In other words, that clause does nothing more than summarize the other provisions of the contract by which the plaintiffs undertake to have their work done in the first instance in the six establishments mentioned in the agreement. When these establishments are provided with work plaintiffs have full right to employ such number of additional submanufacturers as they can supply with work, with or without the consent of the union. The approval of the union is limited to the particular choice of submanufacturers or contractors. The union requires to be given an opportunity to ascertain whether such additional submanufacturers or contractors maintain proper standards of work before the plaintiffs are permitted to employ them. And even on that point the decision of the union is not final, because any dispute that may arise between them must be settled by arbitration.

The other part of paragraph 6 to which plaintiffs object as being contrary to law reads as follows: " In no event shall the employer do any work for or sell any goods to or have any work done by or purchase goods from any concern against whom the union has declared a strike."

This provision likewise must be interpreted in the light of the whole agreement. The terms " sale " and " purchase," as previously stated, relate merely to the outward form of the transaction between the plaintiffs and the submanufacturers who produce goods for them. Interpreted in the light of the whole agreement, the plain meaning of the clause is that the plaintiffs will not supply garments to manufacturers against whom the strike has been declared by the union, and that they will not have their garments made by submanufacturers against whom such a strike has been declared. The union thus insists that its members shall not be placed in the position of strikebreakers against their fellow members in any form. The union's right to insist upon a clause which will safeguard the right of one group of its members to refrain from breaking the strike of another group of its members cannot be denied.

It is an organic part of the general right of workers to strike for

proper causes and to invoke the support of their fellow workers in such a strike. Similarly the union has a legal right to take the position that none of its members will work for the plaintiffs if some of the latter's work is done by strikebreakers. This is an inevitable corollary of the well-recognized principle that members of a union have a right to refuse to work with non-union men, and even to strike for the discharge of such non-union men. Assuming that the plaintiffs produce all their garments through the medium of six subcontractors, and the employees of three of such subcontractors are on strike, and their work is being done by strikebreakers, the members of the union in the three shops not on strike, in the absence of the above clause, would be compelled to furnish part of the plaintiffs' garments, while the other part would be furnished by non-union men and strikebreakers, and again the union members thus continuing to operate for the plaintiffs would at least indirectly be instrumental in breaking a strike of their fellow members in the union. In this connection it must be borne in mind that we are not dealing here with activities of the union, undertaken of its own sole accord and directed against a hostile employer, but with an agreement made by both parties.

The question before the court, therefore, is not whether a labor union, in the absence of an agreement, would have the right to call a strike in order to prevent an employer from doing work for another employer against whom a strike is pending, or from giving work to such an employer, but whether an employer and a union of workers may voluntarily enter into an agreement to that effect without offending the Anti-Monopoly Act or any other law. The answer is they may. Labor organizations have a right to appeal to the community at large, or any specific member of the community, and request that he withhold patronage from any person against whom they have a grievance. 12 C. J. 574; *Mills* v. *U. S. Printing Co.*, 99 App. Div. 605; *Cohen* v. *United Garment Workers of America*, 35 Misc. Rep. 748; *People* v. *Radt*, 71 N. Y. Supp. 846. If they have such right, even in the absence of an agreement, it surely cannot be contended that they offend the law by making such agreement. That the workers have a right to agree among themselves and *a fortiori* with the employers to refuse to do the work of their striking fellow workers directly and indirectly, or to work with non-union men, or to handle the products of non-union workers, has been declared by the courts of this and other states in an unbroken line of decisions.

The case of *Bossert* v. *Dhuy*, 221 N. Y. 342, may probably be considered the leading authority upon this point. The United Brotherhood of Carpenters, a labor organization, had established

a rule prohibiting its members from handling woodwork produced in non-union shops, even when used by employers who worked under union conditions and against whom the union otherwise had no grievance. The plaintiff, a manufacturer of such " nonunion " woodwork, brought an action to enjoin the brotherhood from carrying out the said rule, taking a position analogous to that urged by the plaintiffs herein; *i. e.*, that while the workers had a right to strike against their direct employer for any legitimate reason, they had no right to strike against a contractor operating under union conditions, and against whom they have no grievance other than his handling the work of an outside manufacturer, against whom another set of workers in their craft had a grievance. The court (p. 355) overruled the contention in the following language: " It was not illegal, therefore, for the defendants to refuse to allow members of the Brotherhood to work in the plaintiff's mill with non-union men. The same reasoning results in holding that the Brotherhood may by voluntary act refuse to allow its members to work in the erection of materials furnished by a non-union shop. Such action has relation to work performed by its members and directly affects them."

And again (p. 364): " When it is determined that a labor organization can control the body of its members for the purpose of securing to them higher wages, shorter hours of labor, and better relations with their employers, and as a part of such control may refuse to allow its members to work under conditions unfavorable to it, or with workingmen not in accord with the sentiments of the labor union, the right to refuse to allow them to install non-union-made material follows as a matter of course, subject to there being no malice, fraud, violence, coercion, intimidation or defamation in carrying out their resolutions and orders."

The other objections made by the plaintiffs to the legality of the agreement are those dealing with the equal distribution of work among the plaintiffs' employees in their inside and outside establishments, during the term of the agreement, and the correlative provision that no employee or submanufacturer be discharged during the term of the agreement without cause. These are part of the conditions imposed by the workmen in consideration of entering the employ of plaintiffs. They are embodied in the agreement between the parties and are not contrary to law.

Plaintiffs contend that the agreement in question constitutes an illegal monopoly, within the meaning of section 340 of the General Business Law (as amd. by Laws of 1918, chap. 490, and Laws of 1921, chap. 712). This section reads as follows: " Every contract, agreement, arrangement or combination whereby a monopoly in

the manufacture, production or sale in this state of any article or product used in the conduct of trade, commerce or manufacture or of any article or commodity of common use is or may be created, established or maintained, or whereby competition in this state in the supply or price of any such article, product or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within this state of the manufacture, production or sale of any such article, product or commodity, the free pursuit in this state of any lawful business, trade or occupation is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void."

The agreement in question does not tend to create a monopoly in the production of cloaks and suits or to restrain or prevent competition in such commodities. According to the evidence referred to above, there are 3,000 cloak manufacturers in the city of New York alone, and no agreement with the plaintiffs can affect competition among them. Nor can the contention be supported upon the theory that the union as such constitutes a monopoly of labor, because it embodies the vast majority of workers in the industry, or because it undertakes by the agreement under discussion to regulate the wages and to secure the tenor of employment of its members.

Parties dealing with commodities, so long as they are not engaged in public or *quasi*-public service, have a right to fix the prices of their commodities and to refuse to sell them to the public for less than a fixed price. *Walsh* v. *Dwight*, 40 App. Div. 513; *Kohart* v. *Skou*, 163 id. 899; *Park & Sons Co.* v. *Nat. Druggists' Assn.*, 54 id. 223. The principle applies in even a higher degree to the right of workers, acting singly or in concert, to sell their labor at fixed prices and on other stipulated terms. The labor of a human being is not a commodity or article of commerce whose sale may be regulated by law, but it is personal service which may be arbitrarily withheld or rendered on arbitrary terms. A man's labor is his own, and he has the right to dispose of it upon the best terms he can secure. The policy of our national government on that point is definitely established by the provisions of section 6 of the Clayton Act (38 U. S. Stat. at Large, 731; U. S. Comp. St. § 8835f), which reads: " That the labor of a human being is not a commodity or article of commerce. Nothing contained in the anti trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such

organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti trust laws."

Professor Williston, in his work on Contracts (vol. 3, § 1655), expresses the following opinion: " In view of the modern social and economic attitude of large numbers of the community towards labor unions and the judicial expressions in certain cases involving, to be sure, allegations of criminal or tortious combinations, not the validity of a contract as such, it seems probable that the ordinary principles governing contracts in restraint of trade would not now generally be applied to combinations of workmen."

Section 582 of the Penal Law of the state of New York (as amd. by Laws of 1918, chap. 491) specifically exempts labor unions from the operation of conspiracies to create a monopoly. For the foregoing reasons, I conclude the agreement is not void or illegal as being in restraint of trade, nor does it violate the Penal Law of the state or of the United States. The agreement is not void for lack of mutuality. It is made between the plaintiffs, designated in the agreement as the employer, and the joint board, representing thirteen local unions, all collectively designated in the agreement as the union, " for and in behalf of the said union and for and in behalf of the members thereof now employed and hereafter to be employed by the employer, with the same force and effect as if this agreement had been made between the said employer and the said union and all individual members now or hereafter employed by the said employer." In substance, therefore, it is an agreement between employer and employees, and every clause of the same undertakes to regulate some phase of the relations between the parties as such employers and employees. Thus it provides for a scale of wages and work hours, for protection of the employees against discrimination in treatment and arbitrary discharges, for approximate equalization of the conditions of the employees in the inside shop and the outside shop, and for an equitable distribution of the available work. These provisions imply equal obligations on the part of the contracting parties — on the part of the employers that they will pay the wages stipulated and observe the other conditions of work set forth in the contract; on the part of the workers that they will render their services upon the terms set forth in the agreement during the term of the same. The status of the union as such in connection with the agreement is primarily that of agent of the employees. The agreement, therefore, is entirely valid as an agreement of employment and is not unilateral. *Meyer v. Schwinger*, 141 N. Y. Supp. 504; *Halpern*

v. *Langrock Bros. Co.*, 153 id. 985; *Goldblatt & Schaeffler, Inc.*, v. *Skudowitz*, 172 id. 339.

The provisions of the 19th clause of the agreement fixing $3,000 as the amount of the liquidated damages in the event of a breach by plaintiffs of the contract or agreement do not create a new liability on the part of the employer. They but liquidate a liability implied by law. Nor is there anything in that clause to exempt the union from its corresponding liability for breach of the agreement on its part. The only difference in the position of the two parties is that in one case the damage, being impossible of computation, is liquidated by agreement, while in the other the damage is left to be proven by computation. The parties have a right to enter into such an agreement, and the same is valid and binding upon them in the light of the surrounding circumstances. See *Seidlitz* v. *Auerbach*, 186 App. Div. 7. I find upon all the evidence in the case that the agreement of July 5, 1923, was not procured by duress or coercion, and that it is not invalid in law, as claimed by plaintiffs.

The plaintiffs having failed to establish the cause of action set forth in the complaint, the complaint is dismissed, with costs, and judgment accordingly is granted in favor of the defendants. Submit decision and findings on notice.

Judgment accordingly.