George J. GALLON, Appellant,

v.

The LLOYD–THOMAS COMPANY, a Corporation, Appellee.

No. 16148.

United States Court of Appeals Eighth Circuit.

March 25, 1959.

Wayne L. Millsap, St. Louis, Mo. (Hocker, Goodwin & MacGreevy, St. Louis, Mo., on the brief), for appellant.

G. Carroll Stribling, St. Louis, Mo. (Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

For the second time we are asked to review the action of the trial court in rendering judgment for defendant notwithstanding the verdict favorable to appellant (plaintiff) on Counts I and IX of plaintiff's amended complaint. On the first appeal, Gallon v. The Lloyd-Thomas Co., 8 Cir., 261 F.2d 26, we concluded we did not have jurisdiction of the appeal from the judgment n. o. v. on Counts I and IX and from the court's order granting a new trial on counts III, V and VIII of the amended complaint. It was demonstrated in our prior opinion that, under the existing circumstances, the granting of the new trial was not as such an appealable order; and that inasmuch as the trial court had not expressly determined by appropriate order that there was no just reason for delay in entering a final judgment on counts and IX and had not entered a final judgment thereon, as authorized by Rule 54(b), F.R.Civ.Proc. 28 U.S.C.A., the appeal was not properly in this Court.

The record now before us establishes that following our dismissal of the appeal, the trial court did make an express determination that there was no just reason for delay in entering final judgment on Counts I and IX and took the additional step of entering judgment thereon against plaintiff and in favor of defendant, all as contemplated by Rule 54(b), supra. From this judgment plaintiff has timely appealed.

As reference to our former opinion will reveal, in Count I plaintiff alleged that on October 13, 1954, as the result of defendant's duress, threats and coercion, he was compelled to sign an agreement with respect to his employment. In this count plaintiff prayed for rescission and cancellation of the contract, and for $25,000 actual damages. The jury awarded him $100 as damages. Count IX sought punitive damages and thereon plaintiff received a verdict for $20,000.

The court's judgment n. o. v. on Counts I and IX, was predicated on the conclusion that if the contract of October 13, 1954, was entered into by plaintiff under duress, it was nevertheless ratified in all respects by him as a matter of law.

In seeking reversal of the judgment, plaintiff advances the contentions that the Court, after all of the evidence was in, fell into error in refusing plaintiff's request to file his fourth amended petition; and that in any event, the evidence does not establish ratification as a matter of law. By the amendment, plaintiff sought to abandon his trial theory, as embodied in the third amended petition; i. e., that the contract was executed by him as the result of duress and coercion,

substituting therefor a new right of action, based upon fraud in the procurement thereof.

■ While, in general, Rule 15 of the Federal Rules of Civil Procedure contemplates that amendments to pleadings should be allowed with liberality where necessary to bring about furtherance of justice and where the adverse party will not be prejudiced, it is a settled rule of practice that the trial court is vested with sound discretion in granting or refusing an amendment to pleadings, and the extent of this Court's review is limited to the question of abuse of this discretion. Wallace v. Knapp-Monarch Co., 8 Cir., 234 F.2d 853, 860; Frank Adam Elec. Co. v. Westinghouse Elec. Mfg. Co., 8 Cir., 146 F.2d 165, 167; Young v. Garrett, 8 Cir., 159 F.2d 634; Holley Coal Co. v. Globe Indemnity Co., 4 Cir., 186 F.2d 291.[1]

■ Here, however, plaintiff points to the more direct provisions of Rule 15(b) which clearly and explicitly provide: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In the same section, further provision is made that upon motion of any party such an amendment may be made at any time, even after judgment. Thus, when evidence beyond the matters covered by pleadings is introduced *without* objection, it is held that, by trying such issues by implied consent, the pleadings are presumed amended. See Moore's Federal Practice, Vol. 3, § 15.13, and Albers Milling Co. v. Farmers Produce Co., 8 Cir., 222 F.2d 915, 918; Vogrin v. Hedstrom, 8 Cir., 220 F.2d 863, 866, certiorari denied 350 U.S. 845, 76 S.Ct. 86, 100 L.Ed. 753; Pasquel v. Owen, 8 Cir., 186 F.2d 263, 271; United States v. Cushman, 9 Cir., 136 F.2d 815, 817, certiorari denied 320 U.S. 786, 64 S.Ct. 194, 88 L.Ed. 473; Falls Industries, Inc., v. Consolidated Chem. Indus., Inc., 5 Cir., 258 F.2d 277, 285.

In the instant situation, it is apparent that plaintiff was not entitled to amend his petition under Rule 15(b), for the question of fraud embraced in plaintiff's fourth amended petition was not the issue that was tried. Further, the trial court cannot be convicted of abusing its discretion in refusing to allow the amendment. An analysis of the evidence will best demonstrate the correctness of this conclusion.

Plaintiff was employed by defendant in November, 1949. In March, 1950, he was appointed district manager in St. Louis, Missouri. For his services in selling appraisal service to business concerns, plaintiff received 15 per cent commission of the initial appraisal charge as well as the annual service charge. In 1952, for reasons not here material, plaintiff was transferred by defendant to New York with a drawing account of $225, with the oral understanding that defendant would

---

1. Since leave of Court must be had for further amendments after the first one under Rule 15(a), it is interesting to note the tests under which leave is granted or denied, for the courts have given various determinative weight to mere lapse of time, prejudice to other party, or lack of good excuse for delay, as being fatal to leave to amend. In this circuit, Frank Adam Elec. Co. v. Westinghouse Elec. Mfg. Co., 146 F.2d 165 at page 167, the Court stated:

"Considering the failure of the defendant to show that its long delay in tendering its counterclaim and its second amendment was due to oversight, inadvertence, or excusable neglect, we can not say that the court abused its discretion in refusing amendments."

In Boo v. Dixon, D.C.W.D.Mo., 43 F. Supp. 214, where plaintiff sought to amend by adding a contract action to his negligence allegations after the jury was empaneled, and in Soden v. First Nat. Bank of Kansas, D.C.W.D.Mo., 74 F. Supp. 498, where plaintiff sought to change his ground for recission of contract from mental incapacity to fraud and duress, leave to amend and insert these new issues was denied.

See also Armstrong Cork Co. v. Patterson-Sargent Co., D.C.N.D.Ohio, 10 F.R.D. 534 and A.L.B. Theatre Corp. v. Loew's Inc., D.C.N.D.Ill., 21 F.R.D. 584 where theories from the various circuits are reviewed.

not charge any overdrafts which plaintiff might incur in New York against his commissions earned in St. Louis. Plaintiff's operations in New York proved unsuccessful. His draw or advancement of $225 a week exceeded his earnings of 15 per cent of the defendant's fee on all contracts closed by plaintiff, and in September, 1954, defendant reduced plaintiff's drawing account to $175 a week. Pursuant to a telephone call from Ernest E. Goran, president of defendant company, plaintiff met Mr. Goran at the Sheraton Park Plaza Hotel in New York on or about October 12, 1954. Plaintiff testified that in the telephone conversation Goran said, " * * * that I had stuck my neck out too far and that a few days or weeks earlier he had received a call from an officer of the Department of Justice in Chicago; that they were investigating my character; that the investigator asked Goran if he knew that I was a bigamist; that he, Goran, didn't want to be implicated so he turned the investigator over to Mr. Gatenbey (vice-president of defendant) to deal with." Getting down to the events in the hotel, it appears that plaintiff's wife was with him, but Goran would not permit her to accompany plaintiff and Goran to the latter's room in the hotel. Plaintiff stated that he was very upset; that he and Goran found Gatenbey in the room and the latter began reading from a paper " * * * and telling me that I was a bad man, a bigamist, promiscuous or maybe worse and went on for nearly an hour and a half or two *until I was completely broken down.*" Continuing, plaintiff testified that Gatenbey "said that if he had had his way he would have fired me long ago; that I would have to get out of the country in twelve hours or else take the consequences." From other testimony we learn that plaintiff came to the United States from England in November, 1949; that he first married Ethel Charle, apparently in England; he then married one Margaret Duffin in Gretna Green, Scotland; he again married in East St. Louis, Illinois, to a woman whom he had met in Toronto, Canada. This marriage was annulled in New York in September, 1953, and on August 10, 1954, plaintiff married his fourth and present wife. At the time of the Sheraton Plaza Hotel incident on October 12, 1954, plaintiff had not been naturalized, and it is apparent that the statements made by Gatenbey in the hotel room caused plaintiff great anxiety and fear that he would be deported from the United States. Following the encounter with Gatenbey, above related, and after Gatenbey had gone into the washroom, Goran informed plaintiff that he had told Gatenbey "not to be so hard on me"; that Gatenbey's friend (a prominent citizen of New York, then an official of that state) would be contacted in an effort to delay the investigation. According to plaintiff's testimony, when he left the hotel room he was so sick that Mr. Goran had to walk him around in the hall before he was in a condition to be taken downstairs.

Mrs. Gallon testified that when she and her husband met Goran in the hotel lobby he stated to plaintiff: "John, you've gone too far this time. We're going to have a terrible time to keep the investigators from bothering you and I am afraid you will be deported, but we will see (what) Mr. Gatenbey and I can figure out about it." Mrs. Gallon stated she waited in the hotel lobby from two until four o'clock p. m. while her husband was with Goran and Gatenbey. That when Mr. Gallon appeared "he was very, very sick. I do not know what he went through, but he really went through something with those people, believe me. My husband was very, very upset. He had been crying you could see." While in the cocktail lounge later in the day, Goran again stated that he and Gatenbey would try to figure out what could be done to prevent the investigation, and plaintiff would be advised. Out of the foregoing came the contract which materially changed plaintiff's remuneration. From further testimony, it seems that following the events above set forth, and within a day or two thereafter, Goran and Gatenbey presented the contract to plaintiff who expressed some reluctance on signing it. There-

upon, Gatenbey lost his temper and stated he was in favor of firing plaintiff right then. In this setting, and with plaintiff still laboring under the fear of deportation, he signed the October 13, 1954, contract. The inference is clear from his testimony that he was then assured by Goran and Gatenbey that the investigation relating to deportation of plaintiff would be stopped and everything would be all right.

The salient features and terms of the October 13, 1954, contract were: Plaintiff acknowledged his services had not been performed satisfactorily; defendant was to retain plaintiff in its employ as long as his services were satisfactory, and his compensation was to be in an amount agreed upon between the parties; plaintiff acknowledged that he was overdrawn in his account with defendant in an amount in excess of $15,000, and authorized defendant to apply any and all credits and moneys due plaintiff from defendant toward payment of the overdraft (this terminated plaintiff's right to continue drawing commission on St. Louis business); plaintiff authorized defendant to pay out of moneys due him the sum of $200 to Mrs. Georgina Bird Gallon, one of his former wives, being the amount of a note held by her.

■■ It is clear to us that the genuine trial issue revolved around and was focused upon the circumstances under which plaintiff entered into the October 13, 1954, contract. Was it the result of duress? That was the question. Plaintiff's testimony was sufficient to warrant a jury in finding that the contract came into existence as the direct result of the threats of Goran and Gatenbey, and that such threats caused plaintiff to be bereft of the quality of mind essential to the making of a contract.[2] Defendant met the duress issue head-on, and introduced evidence tending to prove that the contract was free from the influence of duress or coercion and that it was freely and voluntarily entered into by plaintiff. The record simply does not bear out the assertion that the case was tried on the theory that fraud was practiced by defendant for the purpose of obtaining the contract.[3] That being true, it necessarily follows that there was no basis upon which to rest the fourth amended petition and the court properly rejected the same.

■ Did plaintiff ratify the contract as a matter of law? Appellee insists that in view of plaintiff's actions and conduct, and his attitude toward the contract following its execution, the question must

2. "Under the modern doctrine there is no legal standard of resistance with which the victim must comply at the peril of being remediless for duress imposed, and no general rule respecting the sufficiency of facts to produce duress; the question in each case is whether or not the victim was so acted on by threats of the person claiming the benefit of the contract, as to be bereft of the quality of mind essential to the making of a contract, and whether or not the contract was thereby so obtained." 17 C.J.S. Contracts § 175; to same effect are 17A Am.Jur. Duress and Undue Influence § 11; Restatement of the Law of Contracts, Vol. 2 § 492; Weisert v. Bramman, 358 Mo. 636, 216 S.W.2d 430, 434; Sylvan Mortgage Co. v. Stadler, 113 Misc. 659, 185 N.Y.S. 293, 297, reversed on other grounds 115 Misc. 311, 188 N.Y.S. 165, which was affirmed 199 App.Div. 965, 191 N.Y.S. 955.

3. Evidence going to other issues, even if incidentally touching some elements of fraud, may not be used to support the proposed amendment.

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore, an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, *even though there is evidence in the record—introduced as relevant to some other issue— which would support the amendment.*" (Emphasis supplied.) Vol. 3, Moore's Federal Practice § 15.13 at pp. 846–847. To like effect, see Macris v. Sociedad Martima San Nicholas, S.A., 2 Cir., 245 F.2d 708, 711, certiorari denied 355 U.S. 922, 78 S.Ct. 364, 2 L.Ed.2d 353; Adkins v. E. I. DuPont de Nemours & Co., 10 Cir., 176 F.2d 661, 663–664, certiorari denied 338 U.S. 895, 70 S.Ct. 234, 94 L.Ed. 550; Simms v. Andrews, 10 Cir., 118 F.2d 803, 807.

be answered in the affirmative. We agree. In resolving this crucial issue, we are mindful of the well-established principle of law that a contract entered into as the result of duress is not void, but merely voidable, and is capable of being ratified after the duress is removed. Ratification results if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it. 17A Am.Jur., Duress and Undue Influence, § 26; Restatement of the Law of Contracts, Vol. II, §§ 499 and 484; Annotation 35 A.L.R. 866; Oregon Pac. R. Co. v. Forrest, 128 N.Y. 83, 28 N.E. 137; Greenpoint Nat. Bank v. Gilbert, 237 N.Y. 19, 142 N.E. 338; Maisel v. Sigman, 123 Misc. 714, 205 N.Y.S. 807, 814; Application of Minkin, 279 App.Div. 226, 108 N.Y.S.2d 945, 953–54, affirmed 304 N.Y. 617, 107 N.E.2d 94. An essential element in the doctrine of ratification is intention: indeed, it has authoritatively been said that it is " * * * at the foundation of the doctrine of waiver or ratification." 17A Am.Jur., Duress and Undue Influence § 26 at page 594.

■ Measured by the foregoing standard, the conclusion is inevitable that plaintiff ratified the contract in question. It appears without dispute that at the time the contract was signed, plaintiff was represented by an attorney, and in November or December, 1954, plaintiff informed his attorney of the conference in the hotel room preceding the execution of the contract, and also asked his attorney whether he could in fact be deported. From the time plaintiff signed the contract until he left defendant's employ in July, 1955, he never on a single occasion voiced any objection to the circumstances leading up to the contract nor did he at any time, after the alleged duress was removed, protest to Goran, Gatenbey or any other official of defendant that he had been pressured into signing the contract. To the contrary, he recognized the contract in all of its terms

and provisions. He made weekly reports to defendant, in which he requested payment of his draw allowance of $175, which had been agreed upon. The commissions on the St. Louis, Missouri, business, which accrued after the contract was executed, were retained by defendant; the $200 due plaintiff's former wife was sent to her by defendant in accordance with one of the contract provisions, and in plaintiff's own words: "I never asked them (Goran and Gatenbey) to set the contract aside at anytime until after I resigned from the company. I never made such a claim to Goran, and I never made such a claim to Gatenbey until after I left the company." Not only did plaintiff, after he was removed from the influence of the duress, acquiesce in the contract by performing thereunder, but he wrote a total of six letters to defendant between February 17, 1955, and July 21, 1955, in none of which did he question the validity or enforceability of the contract. Indeed, in the February 17 letter to Mr. Goran, written after the alleged duress, the salutation was "Dear Ernie" and after plaintiff discussed his financial situation at some length he stated: "My loyalty to Lloyd-Thomas Company, meaning you, and my efforts, remain the same as the time I was operating successfully. * * * I know that in asking this vote of confidence is quite a lot but things have changed me to the better all around." In another letter dated June 12, 1955, to "Dear Ernie" (Mr. Goran) plaintiff opened the letter by stating: "I want to thank you for the visit and good time I had with you and the boys last week. It just seemed like many wonderful times I have had there in the past."

In June or the early part of July, 1955, defendant reduced plaintiff's drawing account from $175 to $125 a week. This brought two letters from plaintiff, both written July 21, 1955. In one plaintiff proposed that his headquarters be transferred to Syracuse with a territory in out-state New York, and that he be permitted to draw $175 a week against his earnings. The other letter constituted

his resignation to take effect within thirty days in the event his proposal was rejected. In neither letter did plaintiff question the validity of the contract. When defendant remained firm in its prior decision to reduce the weekly draw to $125, the parties parted company—and it was not until September, 1955, that plaintiff decided to take legal action to rescind or cancel the contract on the ground of duress in its procurement.

Without further discussion of undisputed testimony, bearing on ratification, we are of the opinion and so hold that when all of the facts and circumstances, viewed collectively, are fairly considered, only one conclusion can be reached and that is that plaintiff ratified the contract as a matter of law. Having done so, it necessarily follows that under no theory is plaintiff entitled to actual damages (awarded in Count I) or punitive damages (awarded in Count IX), and that the Court properly entered judgment for defendant on both of said counts.

Affirmed.