354 F.2d 825
 F. L. MOYLAN and Yuk Lan Moylan, husband and wife, Appellants,
v.
AMF OVERSEAS CORPORATION, S.A., dba AMF Overseas Corporation, a corporation, the New Zealand Insurance Co., Ltd., a corporation, Atkins, Kroll (Guam) Ltd., a corporation, Leo Lizotte and G. Niewold, Appellees.
 No. 19845.
 United States Court of Appeals Ninth Circuit.
 December 28, 1965.
 
 Finton J. Phelan, Jr., Agana, Guam, Alvin Buchignani, Hall, Buchignani & Cavagnaro, San Francisco, Cal., for appellants.
 John J. Carniato, John A. Bohn, Arriola, Bohn & Gayle, San Francisco, Cal., for appellees, AMF Overseas Corp., S.A. and others.
 Walter S. Ferenz, Barrett, Ferenz & Trapp, Oakland, Cal., for appellee, Atkins, Kroll (Guam), Ltd.
 E. R. Crain, Agana, Guam, for appellee, New Zealand Ins. Co., Ltd.
 Before BARNES, HAMLIN and MERRILL, Circuit Judges.
 BARNES, Circuit Judge:
 
 
 1
 Appellants, husband and wife, originally sued seven defendants on two causes of action. The first cause of action alleged a conversion, the second a conspiracy to violate the antitrust laws. The seven defendants were five corporations and two persons:
 
 
 2
 (1) Boston Insurance Co., Inc., a corporation (herein Boston);
 
 
 3
 (2) AMF Overseas Corporation, S.A., dba AMF Overseas Corporation (herein AMF);
 
 
 4
 (3) Tenpin, Inc., a corporation (herein Tenpin);
 
 
 5
 (4) The New Zealand Insurance Co., a corporation (herein New Zealand);
 
 
 6
 (5) Atkins, Kroll (Guam) Ltd., a corporation (herein Atkins, Kroll);
 
 
 7
 (6) Leo Lizotte; and
 
 
 8
 (7) Gilbert Niewold.
 
 
 9
 The factual situation is slightly complicated. It would do little good to enumerate all the facts herein. The dispute arose by reason of a "double" authorization to sell six certain damaged pinsetters owned by AMF and being lease-purchased by "authorities of Naval Air Station, Agana, Guam" — either one by Boston, the insurer, and one by AMF, the insured, or both authorizations by Boston. Both the alleys in which they had been placed and the pinsetting machinery itself were badly damaged by Typhoon Karen, which devastated Guam on November 11, 1962.
 
 
 10
 One by one we consider the liability of each defendant.
 
 
 11
 * Boston insured the machines at the time of the typhoon. The assured, AMF, at the request of Boston, sent an expert, defendant Niewold, to Guam to assess the extent of the loss. He reported on March 20, 1963 that the loss was "total," and Boston paid AMF on the loss. We assume Boston received title to the machines, but neither the fact, nor the date thereof is disclosed. Boston never did business in Guam, and was never served in this action. Thus it was never a defendant.
 
 II
 
 12
 Atkins, Kroll is alleged in Count I to have been the agent of Boston, and as such agent, upon inquiry of plaintiffs, allegedly advised plaintiffs that Boston would sell the damaged bowling alley equipment to plaintiffs. This was allegedly on March 25, 1963. Plaintiffs allegedly delivered their check for $150, dated March 25, 1963, to Atkins, Kroll, as agent for Boston (Ex. 2).[1] Atkins, Kroll gave in return a receipt, dated April 1, 1963.
 
 
 13
 Atkins, Kroll is also alleged to have been the agent of New Zealand Insurance Company and Dargan & Co. (insurance adjusters who were not named as defendants).
 
 
 14
 In appellants' reply brief, it is stated and conceded (p. 5):
 
 
 15
 "It was admitted that Atkins, Kroll (Guam) Ltd., held themselves as the duly acting agent for Boston, Dargan & Company and New Zealand Ins. Co. As such agent if they act for the known principal within the scope of agency, the principal should be liable and the agent would not be liable for a breach of a contract on the part of the principal."
 
 
 16
 This concession absolves Atkins, Kroll.
 
 III
 
 17
 Dargan & Company was never named as a defendant, nor was any attempt made to make that company a defendant.
 
 IV
 
 18
 At oral argument before this court, counsel appearing for appellants made several concessions, after assuring this court he was authorized to make them. They were:
 
 
 19
 (1) That under its policy, the New Zealand Insurance Co. was only liable for burglary or theft of the pinsetting equipment, from and after April 3, 1963. Prior to that date the pinsetters had been scrapped.
 
 
 20
 (2) It was also conceded there had been no evidence introduced that any person had removed the pinsetters, in whatever condition they were, with a felonious intent, as required by the terms of the New Zealand policy.
 
 
 21
 (3) That there was no evidence before the district court indicating a conspiracy between any defendants, as charged in appellants' second cause of action.
 
 
 22
 Thus the New Zealand Insurance Co. was entitled to be dismissed from the case by order of the trial judge, without the submission of any issue to the jury.
 
 V
 
 23
 AMF, under the concession, was not a participant in any conspiracy. It was the holder of title to the pinsetters until such time as the Naval Air Station completed its lease-purchase payments, or until Boston paid the insured value to AMF for the total loss occasioned by Typhoon Karen and thus obtained title.
 
 
 24
 If Boston had title to the pinsetters prior to the date of sale, and therefore sold the property twice, it might be held liable to someone, either for conversion or for breach of contract. But Boston was never served as a party, and never subject to the court's jurisdiction in this suit. There was evidence that Boston had title and directed both sales, under the mistaken apprehension it was authorizing but one sale to one person.
 
 
 25
 If AMF had title to the pinsetters at the time of their sale, the foregoing analysis as to the possible liability of Boston would likewise apply to AMF. Thus, if AMF had first sold to the scrap dealer and subsequently sold to appellants, AMF would be open to a suit for breach of contract. If AMF first sold to appellants and subsequently to the scrap dealer, it might be possible to hold AMF for conversion when they sold property to which they no longer held title.
 
 
 26
 Intriguing as these questions of title and remedy may be, they are not available as grounds of decision on this appeal in light of the lack of jurisdiction as to Boston and the lack of evidence as to AMF, i. e., the total failure of proof as to AMF liability in the district court. Appellants were not only unable to establish the order in which the sale to them and to the scrap dealer took place, but were not even able to identify the party who owned the machines at the time of the alleged conversion. The complete absence of proof that AMF held title to the machines and sold first to appellants and subsequently to the scrap dealer justifies the action of the district court in dismissing the complaint as to AMF on the conversion issue.
 
 VI
 
 27
 Tenpin, Inc. was the last corporate defendant. It was named in Count I only, as responsible for the acts of its alleged agents Lizotte and Niewold, particularly when the latter allegedly entered the Naval Air Station "between March 25, 1963 and April 5, 1963" to remove portions of the pinsetters,[2] and "to dispose of the remaining portions as scrap." (Complaint, ¶X)
 
 
 28
 The complaint charged a common law conversion after an alleged transfer of title on March 25, 1963 to plaintiffs. Tenpin did not buy any scrap, but did take three shock absorbers. The only evidence was that this taking (and transfer of title, if any) was prior to March 25, 1963, during the time AMF had title. (Tr. pp. 187-91, particularly p. 191, lines 6, 7.) Tenpin could not have converted from plaintiffs, and (it having been conceded Tenpin was not party to any conspiracy) it was entitled to be dismissed as a defendant.
 
 VII
 
 29
 We come to the two individual defendants.
 
 
 30
 At the time of the pretrial order (filed April 24, 1964), defendant Niewold had not been served, and defendant Lizotte was dead and had never been served. Niewold was a nonresident of Guam. The trial judge found (Clk's Tr. 44):
 
 
 31
 "The defendant, Niewold, appeared as a witness * * *. He came to Guam for the sole purpose of testifying in the action on behalf of his employer and, while attending court, was served with summons and a copy of the complaint. On motion, the court quashed service of summons on Niewold."
 
 
 32
 The record fails to disclose this motion, or its supporting papers. Appellants, in two pages of their opening brief, state twice that "Mr. Niewold, as an individual was a proper party defendant, having no immunity to process," and "not entitled to any privilege [against] being served," and therefore error existed. No case is cited in support of the claimed error.
 
 
 33
 In the appellants' reply brief, nine lines are devoted to the subject — again without citation of authority.
 
 
 34
 We agree that Niewold was a proper defendant, but find he was exempt from service under the circumstances here present. Lamb v. Schmitt, 285 U.S. 222, 52 S.Ct. 317, 76 L.Ed. 720 (1932); Page Co. v. McDonald, 261 U.S. 446, 43 S.Ct. 416, 67 L.Ed. 737 (1923); Stewart v. Ramsay, 242 U.S. 128, 37 S.Ct. 44, 61 L.Ed. 192 (1916); Mississippi Wood Preserving Co. v. Rothschild, 201 F.2d 233 (5th Cir.1953). 2 Moore, Federal Practice § 4.20, at 1093-4 (2d ed. 1964).
 
 VIII
 
 35
 There having been no proof supporting a theory of any concerted action, either as a conspiracy or otherwise, in support of appellants' second cause of action, and all defendants other than AMF having been properly dismissed, and there being no cause of action in contract pleaded or urged against AMF, we conclude there was no jury issue left, and the trial judge was correct in dismissing the action as to some defendants and directing verdicts as to the remaining defendants. Cf. 5 Moore, Federal Practice § 50.02. at 2313-4 (2d ed. 1964).
 
 IX
 
 36
 Appellants also urge that certain taxing of costs was improper. No cases are cited in their opening brief. One case is cited in their reply brief — Farmer v. Arabian American Oil Co., 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964). Appellants challenge the right of the district court to tax as costs the expense of transportation of Niewold from Japan to Guam and back.
 
 
 37
 Authorities indicate that taxing a witness's travel expenses as costs is a matter for the discretion of the trial court. Thus, we are only concerned with whether such discretion was abused in this case.
 
 
 38
 Rule 54(d) of the Federal Rules of Civil Procedure vests in the district court a general power to tax costs. 28 U.S.C. § 1920 includes among costs which may be taxed "(3) Fees and disbursements for printing and witnesses;" and 28 U.S.C. § 1821 sets forth the mileage and travel fees which witnesses are required to be paid. The cases indicate that travel expenses are proper items for taxation against the losing party. The major conflict in this area has been whether or not the travel costs which could be taxed were limited to costs of travel within the area encompassed by the subpoena power of the court hearing the action. A growing body of authority indicates that travel costs which may be taxed are not limited to the area of the subpoena power and can be taxed even when the witness has attended without having been subpoenaed. Cf. Maresco v. Flota Mercante Grancolombiana, S.A., 167 F.Supp. 845 (E.D.N.Y. 1958); Bank of America v. Loew's International Corporation, 163 F.Supp. 924 (S.D.N.Y. 1958). This controversy seems to have been laid to rest by the very case which, ironically, appellants rely on in their reply brief (p. 4). In Farmer v. Arabian American Oil Co., supra, the Supreme Court held that the 100-mile subpoena provision in Rule 45(e) of the Federal Rules of Civil Procedure does not completely bar a district court from taxing as costs expenses of transporting witnesses more than 100 miles, for Rule 54 (d) does leave the district court discretion to tax such expenses. The Court said:
 
 
 39
 "While this Rule could be far more definite as to what `costs shall be allowed,' the words `unless the court otherwise directs' quite plainly vest some power in the court to allow some `costs.' We therefore hold that Judge Weinfeld was correct in treating this case as an appeal to his discretion." 379 U.S. at 232, 85 S.Ct. at 415.
 
 
 40
 In the present case Niewold was a witness particularly able to shed light on the transactions in dispute. After being sent to Guam on behalf of his employer AMF he was served with a subpoena by appellants and put on as a witness in their behalf. We must assume he was a necessary and material witness. The district court declined to find that he was adverse. We cannot find that the district court abused its discretion in taxing the costs of Niewold's transportation ($433.50) to appellants.
 
 
 41
 The decision of the district court is affirmed in its entirety.
 
 
 
 Notes:
 
 
 [1]
 There is some question as to the authenticity of the dates of certain letters and checks in evidence below. The pinsetters were removed from the Naval Air Station by the Island Equipment Company for scrap between Friday, March 23, 1963 and March 27, 1963. Niewold reported to Atkins, Kroll orally on March 19, 1963 that the machines had value only as scrap. On March 20, 1963, Atkins, Kroll reported this fact to Dargan & Co., Inc., insurance adjusters for Boston Insurance Co. in New York, and also that Boston had requested a written report from Niewold; that such written report had been received; that there was no scrap value to the damaged equipment; and that "a local scrap buyer has agreed remove from base free in exchange for scrap advise Bostinsur."
 Niewold says he received authorization to sell the goods for scrap on March 22 or 23, and immediately communicated the "go ahead" to the scrap company. Mr. Sgro of the scrap company testified he received the "go ahead" telephone call from Niewold on Friday, March 22, 1963, and removed the scrap on Monday, March 25, 1963. The time of day is not shown. Niewold left Guam by plane at 5:00 A.M. on March 25, 1963.
 Appellants claim Atkins, Kroll contacted a representative of the insurance company in New York and were advised on the 25th day of March, 1963, that they could sell the damaged units. (Appellants' Opening Brf., p. 2.) Appellants claim to have received a letter (Ex. 5) from Atkins, Kroll (acting for Boston) on March 25, 1963. We note the envelope attached to this letter (Ex. 5) was never postmarked, and was apparently delivered by hand. By letter (Ex. 3), also dated March 25, 1963, appellants tendered their check (Ex. 4) also dated March 25, 1963, for $150, and asked Atkins, Kroll to place $30,000 insurance on the the damaged equipment.
 Exhibit 3 shows the letter dated March 25, 1963 was stamped (apparently by Atkins, Kroll) as received April 1, 1963, one full week after the mailing date. (The apparent delay in delivery between two business houses, each using post office boxes at the same post office in the same city, is unexplained.) Atkins, Kroll issued a numbered receipt dated April 1, 1963 for $150 (Ex. 2). Moylan's numbered check for $150 was cashed April 2, 1963 (Ex. 4). Atkins, Kroll replied to the Moylan letter, dated March 25, 1963, on April 1, 1963, declining to accept the "high valuation" proposed by Moylan, refusing to insure, and suggesting: "We * * * appreciate your offer of this insurance, but under the circumstances suggest you contact your regular insurers, who may be able to offer you the coverage you desire." (Emphasis added.) (Ex. 6)
 The New Zeland policy was issued April 4, 1963, effective as of April 3, 1963. The latest date on which any witness claimed the pinsetters had not been removed from the Naval Air Station by the scrap purchaser, Island Equipment Co., was March 27, 1963. Thus Moylan had nothing to insure on April 3, 1963, and no insurable interest on which to base his claim, made April 5, 1963.
 
 
 [2]
 Three used springs had a value when new of $10.00 each