BANKERS TRUST COMPANY, Respondent, v. INTERNATIONAL RAIL-
WAY COMPANY, Appellant.

First Department, January 11, 1924.

Bills and notes — action to recover balance due on promissory note given
by corporation holding all defendant's stock to raise money used by
defendant — evidence does not support verdict that defendant agreed
to repay loans — defendant could not, under terms of mortgage given
by holding corporation, make agreement to repay loan — corporations
— defendant's president did not have express or implied authority to
make alleged agreement.

In an action to recover the balance due upon a promissory note made by a
corporation holding all the capital stock of the defendant, a verdict in favor
of the plaintiff, on the theory that while the note was executed by the holding
corporation the money was used by the defendant which made an alleged
agreement to repay the loan, is against the weight of the evidence and must be
set aside, since it appears that a mortgage executed by the holding corporation
prohibited the defendant from borrowing money except from the holding
corporation and from making the agreement in question; that the evidence
given by the defendant to the effect that the alleged agreement was not made
is supported by the original note and the renewal thereof, by payments made
thereon by the holding corporation, by the fact that the plaintiff appropriated
a deposit maintained by the holding corporation in part payment of the note
but did not appropriate in part payment of the note a deposit which the
defendant maintained in its bank; that all the transactions in reference
to the note were made with the holding corporation and not with the defendant;
and that the only evidence in support of the agreement is that of a vice-president
of the plaintiff.

Furthermore, there is no evidence that the defendant's president had any express
authority to make the contract in question, and no implied authority exists
authorizing the president of the defendant to make a contract of this nature
which is not in the ordinary business of the corporation.

APPEAL by the defendant, International Railway Company,
from a judgment of the Supreme Court in favor of the plaintiff,
entered in the office of the clerk of the county of New York on
the 7th day of April, 1922, upon the verdict of a jury, and also
from an order entered in said clerk's office on the 24th day of April,
1922, denying the defendant's motion for a new trial made upon
the minutes.

*Penney, Killeen & Nye* [*Frank C. Laughlin* of counsel; *Thomas D.
Thacher* and *James Sweeney* with him on the brief], for the appellant.

*White & Case* [*Nathan L. Miller* of counsel; *James Adam Murphy*
with him on the brief], for the respondent.

SMITH, J.:

The judgment appealed from was recovered for a balance due
upon a promissory note made by the International Traction Com-

pany to the order of the plaintiff. The claim of the plaintiff is that while the note in question was not made or indorsed by the defendant, it was made for the benefit of the defendant to raise money that was used by the defendant, and that the defendant agreed to pay the consideration therefor. This is denied by the defendant.

The defendant is a street railway company owning and operating railways in Buffalo and Niagara Falls and between those two places in the State of New York. The plaintiff is a banking corporation doing a banking and trust business in New York city. The plaintiff was the owner and holder of a promissory note for $500,000, dated August 14, 1917, made by the International Traction Company to the order of the plaintiff payable ninety days after date, and it is for a balance due upon a renewal of this note that judgment has been taken as above. The International Traction Company was a New Jersey corporation, and at the time of the making of the above note and until November 26, 1919, was the owner of all of the capital stock of the defendant. The traction company was organized in 1889 for the purpose of acquiring street railways in Buffalo and vicinity and thereafter did acquire all of the capital stock of the defendant, which was organized shortly after the traction company to take over several separate railway properties in the above locality. On November 1, 1912, the traction company, being then the owner, as above mentioned, of all the capital stock of the defendant and of other securities, executed to the Guaranty Trust Company, trustee, a collateral mortgage to secure an authorized issue of $18,335,000 traction company bonds and pledged the above-mentioned stock and securities as security therefor. On the same date, November 1, 1912, the defendant executed a mortgage to the plaintiff, as trustee, upon all of its properties to secure an issue of $60,000,000 bonds called refunding and improvement bonds. Of these bonds, a part was reserved to refund bonds secured by underlying mortgages issued by companies acquired by or consolidated with the defendant, and a part were issued to the traction company for advances made to the defendant and part were issued to the defendant for expenditures made for capital account. The balance of these refunding bonds were held by the trustee for sale and to be issued only on certain conditions, one of which being the payment to the trustee of money to the amount of par or face value of the bonds to be issued. The mortgage to the Guaranty Trust Company, as trustee, first above mentioned, contained the following clauses:

*Section 11. * * * If, (except as hereinafter in section 12 of this article provided) the Railway Company, or any other com-

pany of whose capital stock the greater part shall be subject to this indenture, or the Crosstown Street Railway Company of Buffalo (such last named company being in this indenture termed ' Subsidiary Company of the Railway Company '), shall voluntarily create or shall suffer to be created any new lien or charge upon its property or income, or shall create or shall suffer to be created any new indebtedness other than indebtedness to the Traction Company, or indebtedness for the current operating expenses of any such company during a period not exceeding three months, then it (the Traction Company) will acquire such lien, charge or indebtedness, and will cause the same to be vested in the Trustee, or will cause the same to be paid or discharged, or will make adequate provision for the satisfaction or discharge thereof.   * * *

" Section 12.   * * *   The Traction Company will not, by affirmative vote or by refraining from voting, or by assent or consent, or in any manner or form, sanction or permit or allow the Railway Company, or the Subsidiary Company of the Railway Company, to create or to issue any mortgage, or other lien, on its property, or to issue any bonds secured thereby, or by any existing mortgage on the property of the Railway Company or on the property of said Subsidiary Company, or to guarantee any bonds or to create any indebtedness except current operating accounts by the Railway Company for a period not at any date exceeding three months prior thereto.   * * *

" Section 13. Any and all claims or indebtedness which the Traction Company hereafter may acquire against the Railway Company or the Subsidiary Company of the Railway Company (subject to the provisions in respect thereof in this indenture contained) shall be and shall become subject to the lien of this indenture.   If and when requested in writing by the Trustee, the Traction Company will execute to the Trustee appropriate assignments thereof."

Of this mortgage and the above clauses the plaintiff had full knowledge.

In the spring of 1917 the defendant desired to improve its railway service between Buffalo and Niagara Falls by the construction and equipment of a high speed addition and obtained the consent of the Public Service Commission to do so and to issue for that purpose $2,667,000 face value of the refunding bonds and to sell the same at not less than eighty-five per cent of face. The defendant endeavored to sell these bonds but found that the market was not propitious for their sale even at eighty-five per cent of face, but it was learned that the traction company, the owner of the defendant, would be able to raise on its own notes secured

by bonds of the railway the sum of $1,900,000 in the following way: Rollins & Co. would purchase $2,000,000 of the traction company notes secured by the whole of the above authorized issue of $2,667,000 of refunding bonds at ninety-five per cent of the face of the notes, thus realizing the $1,900,000. But the railway and the traction companies were faced by two conditions precedent to obtaining the $1,900,000; one, that the mortgage securing the bonds required $2,667,000 in cash to be paid to the plaintiff as trustee to obtain the bonds (see mortgage by defendant to Bankers Trust Company, defendant's Exhibit D); the other the requirement that at least eighty-five per cent of the face of the bonds must be realized before the bonds could be issued. If the bonds could be sold at eighty-five to meet the last condition the sum of $2,266,950 could be realized, which would leave the sum of $400,050 to be raised to meet the first condition. There was no *bona fide* market for the bonds and only $1,900,000 was in sight, so that in order to meet both of the above requirements the sum of $767,000 was needed. In good faith to the Public Service Commission the bonds could only be used by a sale at eighty-five, so that the railway would have to pay $400,050 in addition to the amount realized on such sale, and any additional sum necessary to release the $2,667,000 would have to be raised by some other party. To meet this situation a plan was devised by which the bonds were sold to the traction company through its affiliated company, the United Gas and Electric Engineering Company, at eighty-five per cent of their face, and the burden was on the traction company and the engineering company to raise the $2,266,950 necessary to consummate that purchase. To do this the traction company could obtain $1,900,000 from Rollins & Co. and still required $366,950, and to release the bonds from the hands of the trustee the additional sum of $400,050 would be needed. This last amount was primarily the obligation of the railway which did not have that amount available and looked to its sole stockholder, the traction company, to assist in taking care of the obligation. Therefore, in addition to the plan of sale of the bonds as above to the engineering company, some plan had to be devised to assist the railway to raise the $400,050. Some way seems to have been found to finance a part of the $767,000 and only a balance of $500,000 was needed. The plaintiff agreed to and did advance the $500,000. The plaintiff loaned this amount on the note of the traction company payable to the plaintiff and the proceeds of this note was placed to the credit of the traction company on the plaintiff's books.

To induce the plaintiff to make the above loan the president

of the defendant was introduced to a vice-president of the plaintiff and they had several conferences. The defendant's president stated fully to the plaintiff's vice-president the desire of the defendant to build the extension mentioned and the need of raising $500,000 to carry through the financing. A full statement of the facts was made including the fact that the defendant was prevented from incurring any obligation for capital expenditures by the clauses above set out in the Guaranty Trust Company mortgage, except as it might obligate itself to the traction company. There was also emphasized the necessity of complying with the requirement of the Public Service Commission by which the defendant would be prevented from obligating itself for more than fifteen per cent of the face of the bonds required to be issued. The plaintiff's vice-president expressed the desire to have the note of the defendant and the defendant's president reiterated his statement that the defendant could not be obligated for the $500,000 desired. It is here that the only issue of fact in the case arises. The plaintiff claims that the defendant, through its president, said that the $500,000 was desired by the defendant, and that the defendant would repay the amount, but desired that the traction company note should be taken to represent that obligation. The defendant insists that no such agreement was made; that the only statement in that connection that was made by the defendant was that the traction company had been receiving dividends from earnings of the defendant, and that the defendant would continue to make earnings and pay dividends which might be increased by the operation of the proposed extension, and that such earnings when paid to the traction company could be used by the traction company to pay the note in question. It was upon this point alone that the question went to the jury. The plaintiff made a loan on the note of the traction company. It knew that the railway company could not obligate itself to any one but the traction company under the conditions of the Guaranty Trust Company mortgage, and that it could not, in any event, in good faith to the Public Service Commission, obligate itself for more than $400,050, the fifteen per cent discount on the $2,667,000 face value of bonds. A series of contracts between the traction company, the railway company and the engineering company, and also a series of letters showing how the transaction was to be handled, were prepared, which were submitted to the plaintiff just before the closing of the transaction, and the loan was made with all the facts disclosed by those contracts and letters before the plaintiff. The proceeds of the $500,000 note of the traction company was placed to the credit of the traction company, and the first step in releasing the bonds

to be delivered to the engineering company and through it to Rollins & Co. was taken on the day of date of the note. It will be of interest and importance to follow somewhat in detail this closing transaction.

Rollins & Co. had agreed to purchase the above $2,000,000 of traction company notes in installments, viz., $500,000 August 15, 1917, $750,000 September 1, 1917, and other smaller amounts later. The method of taking up these different amounts is shown by what was done by the first sum, *i. e.*, the $500,000 in notes with which $667,000 of bonds had to be delivered and cash to that amount paid to the plaintiff as trustee. Rollins & Co. gave their check to the engineering company for $476,166.67, being ninety-five per cent of the $500,000 of traction company notes plus accrued interest. The engineering company, having purchased the $667,000 bonds at eighty-five, was required to pay $566,950 plus accrued interest. It paid this by turning over the $476,166.67 received from Rollins & Co., and looked to the traction company to pay the balance. This would still leave $100,050 to be paid to make up the face of the bonds needed to clear this part of the transaction. The traction company, having received from the engineering company the check of Rollins & Co., deposited it in its account with the plaintiff, which account was already credited with the proceeds of the $500,000 note taken by the plaintiff. Three checks were drawn by the traction company against this account, one of $568,246.94, one of $100,050, and one for $8,337.50, aggregating $676,634.44, the amount of the bonds to be taken down plus accrued interest. It will be noted that one check was for $100,050, the fifteen per cent discount on these bonds, although three checks were drawn by the traction company on the same account with the plaintiff. The same method was followed in each of the installment settlements, in each instance a separate check for the fifteen per cent being given. In the first, second and fourth settlements this fifteen per cent check was given by the traction company, aggregating $220,200; but in the other six settlements the check of the railway company on its own funds was given to the plaintiff, the total of the six checks being $179,850. The checks given by the traction company for $220,200 were given at the request of the railway company, and were in each instance charged by the traction company on its books against the railway company. During the progress of the different settlements above mentioned the railway company repaid to the traction company sums aggregating $165,170.29, which were applied by the traction company on its books to the credit of the railway company on account of the above advances for discounts. This payment by the railway

company was proved by plaintiff, and when the railway company attempted to show other payments to the traction company on that account, it was not permitted so to do.   There was enough proof, however, to show that the railway company had fully repaid to the traction company the full amount of the advances for the fifteen per cent discount.

The above recital shows that the railway company, being under original obligation to pay the fifteen per cent discount which was allowed by the Public Service Commission, has fully met that obligation.

When the promissory note of the traction company became due, it being a ninety-day note, the plaintiff wrote to the traction company calling its attention to the due date of the note and to the necessity of paying $100,000 thereon.   This note was renewed for a further period of ninety days, $100,000 being paid thereon. The traction company gave its renewal note and paid the $100,000 by its check on the plaintiff.   It raised the amount from the defendant in two ways, the defendant sent its check on its bank account for $50,000, and its check for about $53,000 on its dividend account which was due to the traction company.   The traction company deposited these two checks in its account with the plaintiff against which it drew the check for $100,000 paid on the renewal of the $500,000 note.   There were introduced in evidence several other items of correspondence and several other reports and statements, all of which showed that the loan was made only to the traction company; and it is significant that there is no bit of evidence other than the testimony of the vice-president above referred to, showing any obligation of the defendant to pay the note in question or any part thereof, except as it should indirectly pay the traction company for moneys advanced by it to the defendant.   To be sure, there are one or two letters of the defendant which might be held to indicate some such intent, but they are much more consistent and have every indication of being intended to simply state the expectation of the defendant that income would be realized by the defendant to enable it to meet its obligation to the traction company.

The unfortunate result of the non-payment by the traction company of its obligations to the plaintiff was caused by the inability of the defendant to realize earnings from its operation sufficient to pay any dividends to the traction company or even to meet its operating expenses.   This situation was entirely unforeseen or unexpected by the parties, and it is significant that no claim was at any time made against the railway company until long after this default occurred.

There is another significant fact as indicating the intention of the parties herein, that is, that after the last default the traction company had on deposit with the plaintiff $27,985.42, which was appropriated by the plaintiff and applied on this obligation December 3, 1918. At the same time there was on deposit with the plaintiff to the credit of the defendant in its drawing account the sum of $2,191.50, which was not so appropriated by the plaintiff. On the contrary, the plaintiff continued thereafter to credit to the defendant interest on that account until it was finally closed out by the defendant some two years later. This would seem to indicate that the legal liability was deemed by the plaintiff to be that of the traction company and not that of the railway company. It is a fact, also, that every written obligation made for the payment of the money thus borrowed was that of the traction company and not of the railway company; every credit given upon the books of the plaintiff in this transaction was a credit to the traction company's account, and there is not a single credit to the defendant's account. While this loan was indirectly for the benefit of the railway company to enable it to make capital investments, it was primarily for the benefit of the traction company, the owner of all of the defendant's stock. It is not necessary to hold that the testimony of the vice-president of the plaintiff intentionally misrepresented the facts. Human memory is not infallible, and the fact that the railway company had such an interest in obtaining the money might well have biased his memory as to what actually occurred. As opposed to the testimony of the plaintiff's witness, the testimony of the defendant's president is most explicit to the effect that the railway company was assuming no obligation that it could not assume either legally or morally. Under the testimony of the plaintiff's witness the contract sworn to was one that the defendant could neither legally nor morally make. Authorities are numerous as to the inviolability of contracts made in writing in the absence of fraud or mistake. To allow the jury to disregard the evidence of the defendant's president, supported as it is by all the contracts signed, the letters written, and by the credits given on the plaintiff's books, and the legal and moral obligations of the defendant, would be to allow the jury to make a football of written contracts, and would establish a precedent, not only contrary to the sanctity given by the law to written papers, but one that would be most dangerous in business transactions. That these corporations, the traction company, the railway company and the engineering company, all had a part in accomplishing the one purpose, might well prejudice a jury; but the division of the responsibility of these different corporations is expressly per-

mitted by law, and that this is so is known by no one better than by large business interests that accomplish their purposes by these same means. If it be claimed before a jury that these were mere technical evasions, it might well be answered that they were well known to the plaintiff, which was a party to the conspiracy with equal guilt. But they were not technical evasions; they were methods made necessary in the accomplishment of such matters by these railways, and the courts will enforce their lawful contracts as made. The finding of the jury is clearly against the weight of evidence, and for that reason, if for no other, the verdict must be set aside.

But the plaintiff's difficulty lies deeper than the mere question of the weight of evidence. A corporation must act through its agents, and those agents must have authority expressed or implied to make the contracts sought to be enforced. There is no claim of any express authority in defendant's president to assume a corporation liability for this obligation. While the implied powers of a president of a corporation give to him apparent authority to make contracts in the ordinary course of its business, there are no facts shown here that indicate implied authority to the president of the defendant to assume this obligation. This was in no sense the ordinary business of the corporation defendant. The fact that the moneys were used by the defendant to make permanent improvements on its road constitutes no ratification of the contract to pay for this loan when all these moneys came from the traction company to the defendant and not from the plaintiff to the defendant. Moreover there was no evidence attempted to be given that defendant's directors had any knowledge of any assumed obligation by defendant's president in behalf of the corporation.

The full knowledge of the plaintiff of the covenants made by the defendant's sole stockholder that the defendant should not borrow money from any one other than that stockholder, legally nullifies any implied authority of the defendant's president to make the contract claimed, and rebuts any inference of ratification of such a contract. Even if the testimony of the vice-president of the plaintiff be absolutely true, there is still lacking the legal authority to make the contract which he claims was made, or any ratification thereof. The plaintiff required the traction company to secure authority from its directors by express resolution of the directors to make its note, and no such authority was required of or given by the defendant, and it was well known to the plaintiff that such authority could not be given. The method adopted was upon the assumption that such contract could not be made by the defendant's president or board of directors. Upon the plaintiff's evidence

alone, therefore, I can find no express authority to make this contract, and no evidence upon which the law will allow an implication of authority to make same, or any ratification thereof. This leaves the plaintiff with the right of action upon the written contract against the traction company alone.

The plaintiff, therefore, has failed to prove any legal cause of action, and the judgment should be reversed upon the facts and the law, with costs, and the complaint dismissed, with costs.

Clarke, P. J., Dowling and Merrell, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.