**SCIENTIFIC HOLDING COMPANY, LTD., Plaintiff-Appellant,**

v.

**PLESSEY INCORPORATED, Defendant-Appellee.**

**Nos. 180, 368, Dockets 74–1584, 74–1636.**

United States Court of Appeals, Second Circuit.

Argued Nov. 11, 1974.

Decided Dec. 20, 1974.

---

Francis J. McConnell, Chicago, Ill. (Richard Campbell, Chicago, Ill., and Robert M. Blum, New York City, of counsel), for plaintiff-appellant.

James J. Maloney, New York City (Rogers & Wells, William F. Koegel, and John B. Koegel, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, FEINBERG and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

## I. The Facts

Plaintiff Scientific Holding Company, Ltd. (Scientific), an Illinois corporation, is the successor to International Scientific, Ltd. (ISL), a Barbados company which was organized and owned by a number of United States citizens now Scientific's shareholders.[1] Employing approximately 500 individuals, ISL was engaged in the manufacture, assembly, and sale of core memory products, cable harness assemblies, and other electronic and electro-mechanical products to the United States computer and peripheral equipment industry. Defendant Plessey Incorporated, a Delaware corporation, is

---

1. Scientific is not engaged in any business activity and has been continued in existence solely to prosecute the action under consideration here.

a subsidiary of The Plessey Company Limited, a large multinational corporation with headquarters in England, engaged in the electronics business; for reasons not relevant to this appeal, prior to the closing of the contract hereafter discussed, the parent corporation assigned it to the defendant and we shall often refer to the two corporations collectively as Plessey.

During 1967 and 1968, ISL experienced significant operating losses and by August of 1969 it was running short of working capital and was apparently unable to raise funds by issuing either new debt or equity. A sale of the business thus appeared to be the only way for the shareholders to recover even a portion of their investment. At the same time, in mid-1969 English Plessey, which was successfully marketing computer components in Europe, determined that it would be desirable to gain entry into the United States market and it began to explore plans for attainment of that goal. In December 1969, English Plessey learned of the availability of ISL's business and negotiations were begun between the corporations, resulting on February 4, 1970 in an agreement for the sale of all of ISL's assets and business.

A condensed summary of the provisions of the contract, as corrected on February 18, 1970 to conform to the precise language earlier agreed upon, which are important to this appeal, is as follows:

(1) The purchase price consisted of $180,000 payable at the closing, an assumption by Plessey of all ISL's liabilities, except for any obligation evidenced by convertible debentures issued by ISL (other than interest provided therein to the date of the closing), reflected on its December 31, 1969 balance sheet, or incurred thereafter until the closing in the ordinary course of business, and a further payment depending on the amount of profits derived from the use of ISL's assets during the year commencing on the first day of the first calendar month after the closing ("the measuring year"), as described in paragraph (3) below.

(2) In order to allow the assets conveyed by ISL to generate profits during the measuring year, Plessey would make available to the business not less than $600,000 within a week after the closing and continue ISL's business in good faith. It would allow ISL's management to operate the business during the measuring year in accordance with highly complex terms, the details of which are not relevant to this appeal, except that "if ISL profits commencing with the third calendar month of the measuring year average less than Fifteen Thousand ($15,000) U. S. Dollars per month or if there have been three consecutive months of losses during that measuring year (excluding the first two months thereof)", Plessey would have the right to assume full management responsibilities subject to the obligation to continue the business in good faith during the measuring year.

(3) If during the measuring year the profits from the acquired assets were $360,000 or more, Plessey would pay an additional $1,260,000; if the profits were less than $360,000, Plessey would pay an additional amount which bears the same ratio to $1,260,000 that the amount of profits for the measuring year bears to $360,000.

(4) The closing was to take place at Bridgetown, Barbados, W.I., on March 2, 1970.

(5) ISL agreed to hold a common stockholders meeting prior to the closing "for the purpose of voting upon the sale of its assets in accordance with this Agreement. . . ."

(6) ISL represented and warranted, among other things, that an unaudited balance sheet as of December 31, 1969, "to the extent of ISL's knowledge, presents a true and complete statement as of its date of the financial condition and assets and liabilities of ISL",[2] and

---

2. This statement had not yet been prepared when the contract was signed. Instead Plessey had relied on the unaudited November (11 month) financial statements which it had re-

that, with two exceptions not here relevant, there had been no change in its financial condition since December 31, 1969, with the specification that "[o]perating losses not at a rate in excess of Twenty Thousand ($20,000) U. S. Dollars per month for the period from December 31, 1969 to the closing hereof shall not constitute an out of the ordinary change of ISL's condition." Plessey's obligation to close was conditioned, *inter alia*, on ISL's representations and warranties being true as of the time of the closing.

(7) Plessey's obligation to close was also conditioned on the receipt of an opinion of ISL's counsel, a well-known Chicago firm, "dated the closing date" stating in part that:

(ii) The execution, delivery and performance of this Agreement by ISL have been duly authorized and approved by all requisite action of ISL's Board of Directors and stockholders and that this Agreement has been duly executed and delivered by ISL and constitutes the valid and binding obligation of ISL in accordance with its terms;

(8) "This agreement shall be interpreted under and governed by the laws of the State of New York."

At the closing ISL was represented by Kovar, its president and chief operating officer, and Julius Lewis, a partner in the Chicago law firm, who had both negotiated the terms of the agreement. Plessey was represented by Milton H. Albert, its comptroller, and Seth H. Dubin, a partner in a New York law firm which had acted for Plessey in drafting the contract of sale. On the day of the closing Albert spent considerable time with Edward Hourihan, ISL's comptroller, reviewing certain financial information relevant to the closing. At that time, based on his work sheets, Hourihan stated that ISL's losses for January and February aggregated $74,000. He did not prepare a precise breakdown or even give an indication whether any of the

ceived earlier, together with an estimate by ISL's comptroller of probable losses for the month of December.

items comprising the losses possibly were not operating losses for purposes of the loss limitation contained in the contract, see paragraph (6) supra, although ISL claimed at trial that the written financial statement which was provided Plessey after the closing showed that $36,000 of the expenses were for legal and audit fees related to the sale and special bank charges which would not be considered in determining "operating" losses. ISL's year-end statements which were delivered to Plessey at the closing showed sales of only $1,083,000, a gross profit of only $36,000, and an operating loss of $399,000 [3] in contrast with the November 30 figures, upon which Plessey had relied in signing the February 4 agreement, of $1,081,000, $217,000 and $169,000 for the same items. The December 31 balance sheet also revealed that the excess of ISL's liabilities over its assets was approximately $200,000 more than shown in the November 30 balance sheet.

Albert and Dubin refused to close. When Dubin telephoned Warren J. Sinsheimer, Chairman of the Board and chief executive officer of Plessey Incorporated, and a member of English Plessey's board of directors, in New York and informed him that ISL's business was in substantially worse condition than had been represented in the financial statements in his possession and that February had been a "disaster," Sinsheimer's initial reaction was that Plessey should call off the transaction. Later, after a series of conversations with Dubin and Albert, Sinsheimer agreed that Plessey should go forward if ISL agreed to two modifications of the contract. The more important was that the contract clause governing Plessey's right to take over the full management of ISL, see paragraph (2) supra, be amended so that the period in which an "average" of $15,000 in profits had to be attained was effectively reduced from the third to the second month of the measuring year:

3. A later audit by Price Waterhouse & Co. showed that in fact ISL had sustained a 1969 loss of $544,000 on sales of $1,083,000.

if the profits of ISL commencing May 1, 1970 (crediting to the month of May the net profits of the 2-month period comprised of March and April, 1970, but not charging any net loss for that period) average less than $15,000 per month, or if there have been three consecutive months of losses during that measuring year (excluding the first two months hereof). . . .

The other modification was that interest should be charged at a rate of 10% per annum on the additional $200,000 which Plessey then expected to be obliged to invest and that this charge should be considered in determining ISL's operating losses.

The ISL board resolution of January 31, 1970 which had approved the sale of all the corporation's assets to Plessey on the basis of a draft agreement stated that "the proper officers of this Corporation are authorized and directed to make such changes in that agreement as in the opinion of the directors shall be necessary or appropriate · . . .." The summary of the contract contained in the proxy material sent to ISL stockholders prior to the special meeting called to vote on the proposed sale included a reference to the "third month" provision, see paragraph (2) supra; the record does not contain the text of the resolution voted by the stockholders. Kovar testified that at the closing he had expressed doubts to the Plessey representatives with respect to whether he had authority to agree to the proposed amendments; Lewis confirmed that Kovar had expressed doubt as to his authority to Dubin and further indicated that although he had said nothing to the Plessey representatives, he and Kovar had privately discussed the "serious doubts" which they both had as to Kovar's authority to accede to the changes.[4] Nevertheless Kovar finally did sign the modified agreement, allegedly because

ISL's financial condition was so desperate that he had no other choice. The closing was then completed, with ISL delivering, among other things, the required opinion of counsel, see paragraph (7) supra.

ISL did not achieve a $15,000 profit level by May 1970, and Plessey notified ISL by letter dated June 9, 1970 that it was assuming management control. Raymond Carlen, a member of the ISL board, testified that he was first told of the amendment at that time, and that he informed Sinsheimer on July 13 that Kovar had no authority to sign it. Despite investment by Plessey during the measuring year of $1,900,000, an amount greatly exceeding the sum stipulated in the agreement, see paragraph (2) supra, the transferred assets produced a $640,000 loss for the measuring year, and Plessey notified ISL that it would make no further payment beyond the $180,000 paid at the closing.

## II. The Proceedings in the District Court

In this action for breach of contract in the District Court for the Southern District of New York, wherein federal jurisdiction was based on diverse citizenship, Scientific, the successor to ISL, sought to recover the contingent payment of $1,260,000 plus interest, together with punitive damages of another $3,000,000. The complaint was predicated on several alternative theories. One claim was that the amendment at the closing on March 2, 1970 was invalid because of (a) lack of consideration, (b) economic duress, and (c) want of authority on the part of Kovar or ratification by the ISL board; and that Plessey's management takeover in June 1970 was therefore premature and constituted prevention of performance by ISL of the $360,000 profit condition precedent to payment of the contin-

4. The Plessey representatives denied that Kovar had expressed any reservations concerning his authority and cited a July 13, 1973 deposition of Lewis in which he testified that he had no recollection of any such doubts being expressed, but since, as will later appear, the judge directed a verdict against plaintiff on the issue to which the alleged statements are relevant, we have stated the evidence in the way most favorable to Scientific.

gent balance, thereby excusing performance of that condition. The other claim was that Plessey was obligated to pay the $1,260,000 even if the amendment were valid. Here again there were three subordinate theories, to wit, (a) that especially because of the use of the word "average" in the management takeover provision, Plessey was not authorized to take over on the basis of failure to attain a $15,000 profit in the single month of May; (b) that Plessey did not continue ISL's business in good faith during the measuring year; and (c) that Plessey never had any intention of permitting ISL to manage its business.

Plessey counterclaimed for compensatory damages of $3,000,000 plus punitive damages in the amount of $9,000,000 because of ISL's alleged breaches of warranty and deceit, but this claim was limited by Plessey at trial to $106,752 for an alleged breach of two specific provisions of the agreement.

The case was tried before Judge Bonsal and a jury. The judge withdrew from the jury the issue of the validity of the March 2 amendment and directed the jury to consider this to be valid. He instructed the jury to render a special verdict on the other issues raised by Scientific and on those raised by Plessey's counterclaim. The jury found against Scientific on the issues raised by it and against Plessey on the claims of breach of warranty and deceit. Judgment was entered dismissing the complaint and counterclaim, with costs in favor of Plessey. Both parties have appealed.

### III. The Directed Verdict on the Validity of the March 2, 1970 Amendment

#### A.

■ Scientific's argument that the amendment was invalid for lack of consideration immediately collides with § 5–1103 of the New York General Obligations Law, McKinney's Consol.Laws, c. 24–A which removes the need for consideration for a change or modification of a contract, provided that the modifying agreement is in writing and signed by the party against whom enforcement is sought or his agent.

■ Scientific seeks to overcome this seemingly insurmountable obstacle by relying on two bases. One is § 5–1111 of the General Obligations Law, which provides:

If executed by an agent, any agreement, promise, undertaking, assignment or offer required by section 5–1103, 5–1105, 5–1107 or 5–1109 to be in writing, which affects or relates to real property or an interest therein in any manner stated in subdivisions one or two of section 5–703 of this chapter, shall be void unless such agent was thereunto authorized in writing.

This does not assist Scientific for two reasons: First, there is no evidence that the amendment affected or related to real property; ISL had owned a villa in Barbados but, in order that ISL might meet its payroll obligations, Plessey had purchased it for $84,000, to be credited against the contract price, in early February 1970. Moreover, New York courts have held that a corporate officer or director is not an "agent" for purposes of the Statute of Frauds, General Obligations Law § 5–703, requirement that the agent's authority be in writing when executing a contract for the sale or lease for more than one year of real property. See, e. g., Commission On Ecumenical Mission v. Roger Gray Ltd., 27 N.Y.2d 457, 318 N.Y.S.2d 726, 267 N.E.2d 467 (1971) (dictum), and cases cited therein; Flax v. B. M. Development Corp., 35 A.D.2d 565, 313 N.Y.S.2d 591 (2d Dept. 1970) (mem.). The stated rationale for this rule—that "corporations can only act through individuals", Commission On Ecumenical Mission, supra, at 730, 318 N.Y.S.2d 726, 267 N.E.2d 467—is applicable with equal force to the similarly worded written authorization requirement contained in § 5–1111; and we believe that a New York court would hold that a president of a corporation is not an agent within the meaning of that section.

■ Scientific's other basis is a claim that the clause in the agreement which

stipulates that New York law will govern its interpretation, see paragraph (8) *supra*, does not apply to an amendment and that a New York court would therefore apply Barbados law, to wit, the English common law rule requiring new consideration to accomplish a binding modification of an existing contract, Wood v. Benson (1831), 1 L.J.Ex. 18, 2 Cr. & J. 94. This ignores the rationale of the principle that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue". Restatement of Conflicts 2d, § 187(1) and Comment c. This has been stated as follows, *id.* at 565.

Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured. Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.

*See also* Ehrenzweig, Conflict of Laws § 176, at 467–468 (1962). The sales contract was negotiated by American lawyers, mostly in New York City, partly by telephone between New York and Chicago. It would seem most reasonable to assume that the parties intended to weave New York law into all aspects of the relations between them flowing from the agreement. Under these circumstances, it would be foolish to let anything turn on the point that the amendment happened to be executed in Barbados.

B.

The district court was likewise correct in ruling that Scientific had raised no jury issue by its claim of economic duress. The contention was that in addition to its awareness of the precarious financial condition of ISL, as evidenced, among other things, by its purchase in early February of the Barbados villa to enable ISL to raise $84,000 to meet its current payroll obligations, Plessey knew that ISL had previously borrowed $200,-000 from Data 100, another prospective purchaser, secured by pledge of the stock of ISL's principal stockholders; that the loan was past due; that Data 100 had several times threatened to seize and sell the pledged stock; and that Data 100 had agreed to postpone this only because of the representations that ISL was about to close the sale to Plessey which would pay the loan.

It may well be that ISL had little practical alternative other than to accept the modifications on which Plessey insisted. But under New York law that does not suffice to establish the defense of economic duress. As was well stated by Judge Geller in Nixon v. Leitman, 32 Misc.2d 461, 466, 224 N.Y.S.2d 448, 452 (Sup.Ct. N.Y. Co. 1962), the doctrine is that "the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an *unlawful injury*." (Emphasis supplied.) *Accord* Oleet v. Pennsylvania Exchange Bank, 285 App. Div. 411, 137 N.Y.S.2d 779 (1st Dept. 1955); Bachorik v. Allied Control Company, Inc., 34 A.D.2d 940, 942, 312 N.Y. S.2d 272, 275 (1st Dept. 1970) (mem.). If Plessey was entitled not to close, it thus would not be exercising economic duress in insisting on modifications, however little opportunity ISL had to resist. Scientific claims Plessey had no such right or, at least, that the directed verdict was inappropriate when evaluated under the appropriate review standard, *see, e. g.* Ondato v. Standard Oil Co., 210 F.2d 233 (2 Cir. 1954); Lindeman v. Textron, Inc.,

229 F.2d 273, 274 (2d Cir. 1956); Fleming v. McEnany, 491 F.2d 1353, 1357 (2 Cir. 1974), since there were disputed issues of fact.

Even assuming, as we must, see, e. g., Lindeman v. Textron, Inc., supra, that the jury would have believed all the testimony favorable to Scientific and disbelieved all testimony adverse to it, we think that there was no triable issue of fact. It was undisputed that at the closing ISL's comptroller had revealed to Plessey's representatives losses exceeding $20,000 per month for the period from December 31, 1969 to the date of the closing in apparent violation of the operating loss guarantee contained in the sale-of-assets agreement, see paragraph (6) supra. Plessey was entitled to take him at his word. It is immaterial for the issue here under discussion whether calculations not then available to Plessey indicated that the comptroller may have included certain expenses not properly deductible in a determination of "operating" losses for purposes of the loss limitation. Also the December 31, 1969 financial statements afforded substantial ground for questioning whether the November 30 statements, on the basis of which Plessey had entered into the contract, fairly represented the facts; it was hardly possible that December sales had been only $2,000 but that cost of sales had increased by $181,000, see p. 19 supra.

Alternatively, under New York law a contract entered into under duress is generally considered not void, but merely voidable, see, e. g., Levine v. Levy, 285 App.Div. 848, 136 N.Y.S.2d 695 (4th Dept. 1955) (per curiam), and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it. See, e. g., Maisel v. Sigman, 123 Misc.

714, 205 N.Y.S. 807 (Sup.Ct. N.Y. Co. 1924); Port Chester Electrical Construction Corp. v. Hastings Terraces, Inc., 284 App.Div. 966, 134 N.Y.S.2d 656 (2d Dept. 1954); Faske v. Gershman, 30 Misc.2d 442, 215 N.Y.S.2d 144 (Mun.Ct. N.Y.C. 1st Dist. 1961). Since, as will be developed below, Kovar's knowledge of the modifications is attributable to ISL, this requirement was not satisfied.

## C.

Scientific's argument on the score of Kovar's lack of authority is somewhat stronger but not strong enough. Counsel have not favored us with a discussion of New York law [5] with respect to the authority of the president of a corporation, despite the extensive literature, see, e. g., Fletcher, Cyclopedia Corporations Ch. 11, § 581 (1969); 12 N.Y. Jurisprudence, Corporations §§ 617, 620, 629 (1971); Cary, Corporations 205–206 (4th ed. 1969), and case law on that subject. In two early opinions, the New York Court of Appeals stated that the president or other general officer of a corporation engaged in business activities had, by virtue of his office, prima facie power to make any contract for the corporation that the board of directors could have authorized or ratified, and that the burden of proving any lack of authorization was on those seeking to impeach the contract. See Patterson v. Robinson, 116 N.Y. 193, 22 N.E. 372 (1889) (president); Hastings v. Brooklyn Life Ins. Co., 138 N.Y. 473, 34 N.E. 289 (1893) (secretary who was one of corporation's general managing agents). However, a number of subsequent New York cases indicated adherence to the narrower proposition that the presumption of the president's authority extends only to transactions in the ordinary course of the company's business. See,

---

5. Although we believe that a New York court would rule that the choice of law clause in the agreement was sufficiently broad to cover the authority of officers of the parties in executing and performing it, compare Restatement of Conflict of Laws 2d § 291, we need not decide the point. Since neither party requested that the issue of Kovar's authority be determined under Barbados law or furnished

any information about it, see N.Y.C.P.L.R. § 4511(b), a New York court would assume that the common law of Barbados was the same as that of New York, Krasnow v. National Airlines, Inc., 228 F.2d 326, 327–328 (2 Cir. 1955), and cases there cited, or in any event decide the case as if it were. See Restatement of the Conflict of Laws 2d, § 136 comment h.

*e. g.*, Banker's Trust Co. v. International Ry. Co., 207 App.Div. 579, 202 N.Y.S. 561 (1st Dept. 1924), aff'm, 239 N.Y. 619, 147 N.E. 220 (1925) (mem.); Wen Kroy Realty Co., Inc. v. Public Nat'l Bank & Trust Co., 260 N.Y. 84, 183 N.E. 73 (1932).

In 1934, Judge L. Hand, speaking for this court in Schwartz v. United Merchant & Manufacturers, Inc., 72 F.2d 256 (2 Cir. 1934), attempted to discern the precise content of the New York "rule." After briefly summarizing most of the applicable New York decisions, Judge Hand concluded that "there is no absolute rule in New York that any contract which the president of a company may make, however out of the ordinary, throws upon the company the duty of showing that he was unauthorized. It is true that whatever powers are usual in the business may be assumed to have been granted; but the presumption stops there . . .." *Id.* 72 F.2d at 258. Although certain commentators have found this holding to be inconsistent with the *Patterson-Hastings* rule, *see* Note, Inherent Power As a Basis of a Corporate Officer's Authority To Contract, 57 Colum.L.Rev. 868, 873 (1957), most subsequent New York cases, as well as federal cases applying New York law, have adopted the "ordinary business rule", *see, e. g.*, Kraus v. General Motors Corp., 120 F.2d 109 (2 Cir. 1941); O'Connor v. Bankers Trust Co., 159 Misc. 920, 946, 289 N.Y.S. 252, 283 (Sup.Ct. N.Y. Co. 1936), aff'm without opinion, 278 N.Y. 649, 16 N.E.2d 302 (1938); Lieberman v. Princeway Realty Corp., 17 A.D.2d 258, 233 N.Y.S.2d 1001 (1st Dept. 1962), aff'm without opinion, 13 N.Y.2d 999, 245 N.Y.S.2d 390, 195 N.E.2d 57 (1963) (mem.); Greenpoint Coal Docks, Inc. v. Newtown Creek Realty Corp., 5 Misc.2d 812, 814, 91 N.Y.S.2d 466, 469 (Sup.Ct. Kings Co. 1949); American Express Co. v. Lopez, 72 Misc.2d 648, 340 N.Y.S.2d 82, 83 (Civil Ct. N.Y.C. 1973) (chairman of the board). *But see* Best-Site Associates, Inc. v. Ventrice, 245 App.Div. 758, 280 N.Y.S. 583 (2d Dept. 1935) (*per curiam* citing *Hastings* for proposition that president has authority to do any act which directors could authorize or ratify; held to have authority to hire counsel and prosecute action there under consideration).

■ It is clear that even under the *Patterson-Hastings* rule, Kovar did not have authority to bind ISL by the February agreement since this sale of all ISL's assets was not a transaction which the directors could have authorized; indeed the agreement was expressly subject to approval by the ISL stockholders. However, under New York Business Corporations Law § 909(a)(3), McKinney's Consol.Laws, c. 4, and apparently under the stockholders' resolution authorizing the liquidation and sale of assets, the directors could have authorized the changes contained in the March 2 amendment. If the *Patterson-Hastings* rule were indeed the law of New York, this might end the matter since it would not be unreasonable to say that when a corporation dispatches its president to close an authorized contract, it endows him with actual and not merely apparent authority to agree to changes, material but not going to the heart of the contract, for which developments at the closing may call. However, the case becomes closer if, as we believe, the law of New York is what Judge Hand stated in *Schwartz*. And it becomes closer still in view of the statements allegedly made by Kovar to Plessey's representatives at the closing questioning his authority to authorize the amendments since these expressed doubts might preclude reliance on his apparent authority as ISL's president, chief operating officer, and principal negotiator of the agreement. It is an accepted principle of the law of agency that a person with notice of a limitation which has been placed on an agent's authority cannot subject the principal to liability upon a transaction with the agent if he knows or should know that it is outside the scope of the agent's authority. *See* Walsh v. Hartford Fire Ins. Co., 73 N.Y. 5, 10 (1878); Ernst Iron Works, Inc. v. Duralith Corp., 270 N.Y. 165, 200 N.E. 683 (1936); Harvey v. J. P. Morgan & Co., 166 Misc. 455, 463, 2 N.Y.

S.2d 520, 530 (Mun.Ct. N.Y.C. 1937) (dictum), rev'd on other grounds 25 N.Y.S.2d 636 (Sup.Ct.2d Dept. 1938) (*per curiam*), aff'd 260 App.Div. 873, 23 N.Y.S.2d 844 (2d Dept. 1940) (mem.); Restatement of Agency 2d § 166. Knowledge of Kovar's statements alone would hardly constitute express "knowledge" of his lack of authority, such as was present in *Ernst Iron Works*, since his expression of "doubts" might reasonably have been interpreted by Plessey's representatives under the circumstances as a calculated bluff designed to gain additional time both to consider their demands and possibly to negotiate more favorable terms. However, depending upon the authority typically accorded presidents of corporations to approve at the closing modifications of agreements which are outside the ordinary course of business, Kovar's expression of doubt may have been sufficient to place a duty on Plessey to inquire with ISL's board as to the actual scope of his authority, which if not satisfied would prevent it from relying on his apparent authority, *see* Angerosa v. White Co., 248 App.Div. 425, 432, 290 N.Y.S. 204, 214 (4th Dept. 1936) (dictum), aff'm without opinion, 275 N.Y. 524, 11 N.E.2d 325 (1937); Traitel Marble Co. v. Brown Brothers, Inc., 159 App.Div. 485, 487, 144 N.Y.S. 562, 574 (1st Dept. 1913); Goldenberg v. Bartell Broadcasting Corp., 47 Misc.2d 105, 110, 262 N.Y.S.2d 274, 282–283 (Sup.Ct. N.Y. Co. 1965)—an issue to which counsel have not addressed themselves. Likewise they have cited no decisions, in New York or elsewhere, on the precise question of the authority of the president of a company which is selling all its assets or engaging in other transactions not in the ordinary course of business to enter into amendments at the closing, although one would

think it must have arisen. The point is interesting but since we need not decide it in order to dispose of the case, we have felt no compulsion to engage in extensive research on an issue as to which our decision could not settle the law of New York in any event.[6]

The decisive point is that even assuming *arguendo* the March 2 amendment to be invalid as unauthorized, at least if the jury had accepted the testimony of Kovar and Lewis, direction of a verdict was nevertheless proper on the ground that Scientific's failure to repudiate the amendment for lack of authorization until mid-July estopped it from doing so later. In Rothschild v. Title Guarantee & Trust Co., 204 N.Y. 458, 459, 97 N.E. 879, 880 (1912), the Court of Appeals said:

> A principle of law is: Where a person wronged is silent under a duty to speak, or by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself or so as to affect the rights or relations created by it between the wrongdoer and a third person, he acquiesces in and assents to it and is equitably estopped from impeaching it.

The court explained further that the duty to speak and consequent estoppel for silence would arise when the party sought to be estopped:

> remained silent when he had the opportunity of speaking and when he knew or ought to have known that his silence would be relied upon, and that action would be taken or omitted which his statement of the truth would prevent, and that injury of some nature or in some degree would

---

6. We are not impressed with Plessey's argument that the opinion letter of ISL's counsel, see paragraph (7) *supra*, delivered at the closing, to the effect that "[t]he execution, delivery and performance of this Agreement . . . have been duly authorized and approved by all requisite action of ISL's Board of Directors and stockholders . . . .", is decisive in its favor. Plessey was aware that the opinion had been prepared in Chicago prior to the amendment, and Lewis testified that Kovar expressly indicated to Plessey's representatives that he doubted his authority to approve the modifications. While it would have been preferable for Lewis to have revised the opinion to make clear that his firm had not passed on the validity of the amendment, Plessey cannot support a claim that it was misled at the time, assuming that such statements were made.

N.Y. 270, 28 N.E. 627; Collier v. Miller, 137 N.Y. 332, 33 N.E. 374.

Construing the evidence most favorably to Scientific, as we must when considering an appeal by a party against whom there has been a directed verdict, see, e. g., Lindeman v. Textron, Inc., supra, Kovar and Lewis were aware that Plessey was investing substantial amounts in ISL relying in part on the amendment which advanced the date when Plessey could assume full management control unless monthly profits averaged $15,000. They were under a duty to Plessey to advise Scientific's board of directors of the closing amendment immediately on their return to Chicago, so that if the board wished to repudiate the amended agreement Plessey could be promptly informed. Moreover, they were also under an independent duty to Scientific to advise its board of the modifications, see, e. g., C. N. Bank v. Clark, 139 N.Y. 307, 34 N.E. 908 (1893) (dictum); Dickenson v. Tysen, 209 N.Y. 395, 400–401, 103 N.E. 703 (1913); Restatement of Agency 2d § 381, so that if it wished to take some action other than ratification, Plessey could be notified. See, e. g., Hyatt v. Clark, 118 N.Y. 563, 569, 23 N.E. 891 (1890); Klein v. Twentieth Century-Fox International Corp., 201 Misc. 132, 108 N.Y.S.2d 767 (Sup.Ct. N.Y. Co. 1951), aff'm 279 App.Div. 989, 112 N.Y.S.2d 661 (1st Dept. 1952) (mem.).

■ If Kovar and Lewis had "serious doubts" with respect to the former's authority to agree to the amendments, it is almost beyond belief that they did not recognize an imperative obligation to inform their principal which they must fulfill as soon as practicable. If, as they aver, they did not discharge that duty, their knowledge of the amendment is nevertheless imputed to the corporation. In Hurley v. John Hancock Mutual Life Ins. Co., 247 App.Div. 547, 288 N.Y.S. 199, 202 (4th Dept. 1936), the court stated:

It is a well-settled principle of agency that, as a general rule, the principal is bound by notice to or knowledge of his agent in all matters within the scope of the agency, although in fact the information may never have actually been communicated.

See, e. g., Howell v. Mills, 53 N.Y. 322, 328 (1873); Hyatt v. Clark, supra; Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 69, 126 N.E. 260 (1920); Farr v. Newman, 14 N.Y.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964); Hartford Accident & Indemnity Co. v. Walston & Co., Inc., 21 N.Y.2d 219, 225–226, 287 N.Y.S.2d 58, 65–66, 234 N.E.2d 230 (1967) (dictum). Even if Kovar had no authority to amend the contract, attendance at the closing was surely "within the scope of his agency" as the term is used in this context, namely, to exclude attribution of facts which came to the knowledge of the agent when acting in a purely private capacity or adversely to the principal, see, e. g., Credit Alliance Corp. v. Sheridan Theatre Co., Inc., 241 N.Y. 216, 149 N.E. 837 (1925), and all knowledge acquired by him at the closing thus is imputed to the corporation. Moreover, as said in Restatement of Agency 2d § 272, "the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." (Emphasis added.) The period when Scientific was bound to disavow the amendment and repay the $180,000 paid by Plessey on the closing began to run within a few days after March 2—not on June 9 when Kovar notified Carlen that he had acceded to the modifications of the terms of the sale. Scientific could not simply sit by until mid-July, keeping the consideration it had received and allowing Plessey to invest substantial additional funds in the ISL business, and then assert that the amendment on which Plessey had relied in closing on March 2 and also in assuming full management control in early June had not been authorized. It also is of no consequence that when Carlen spoke to Sinsheimer on July 13, the latter allegedly was still optimistic about the realization of a $360,000 profit during the measuring year since Scientific was already estopped to deny the binding effect of the amended agreement

## IV. Scientific's Challenges to the Special Verdict

We can deal more briefly with Scientific's challenges to the verdict on the three issues submitted to the jury and decided adversely to it since here the evidence must be viewed in the light most favorable to Plessey, e. g., Lavender v. Kurn, 327 U.S. 645, 652–653, 66 S.Ct. 740, 90 L.Ed. 916 (1945); Fanale v. Anderson, 427 F.2d 173 (2 Cir. 1970), and the verdict must be sustained if, assuming no reversible error, it is supported by any substantial evidence, e. g., Trade Development Bank v. Continental Ins. Co., 469 F.2d 35, 39 (2 Cir. 1972).

Scientific's first claim is that paragraph 5(d) of the agreement permitting Plessey to assume full management control "if the profits of ISL commencing May 1, 1970 . . . *average* less than $15,000 per month" (emphasis supplied) cannot reasonably be read as entitling Plessey to assume management if profits did not equal $15,000 in the first relevant month, to wit, May. Scientific seeks to buttress this by the fact that a draft of the agreement had required profits of "$15,000 per month in any full month" and was changed to meet its objection. One trouble with Scientific's argument is that considerable surgery on the language would be needed to remould the clause so as to exclude the first month. Also application of the $15,000 requirement to the first relevant month is not so harsh as Scientific alleges, since that month was to be credited with profits of previous months subsequent to the closing but was not to be charged with losses for such months—a very favorable form of averaging.

Scientific further contends, citing Fleischer v. W.P.I.X. Inc., 30 Misc.2d 17, 213 N.Y.S.2d 632 (S.Ct. N.Y. Co. 1961), that Plessey's interpretation of the average profit requirement renders meaningless the provision in paragraph 5(d) that full management control might also be assumed "if there have been three consecutive months of losses during that

measuring year (excluding the first two months [April and May] thereof) . . . ." since that language would permit losses in May, while the average profit provision would require at least a $15,000 profit. We do not find this argument to be compelling. Although perhaps unlikely, losses in May might have been more than offset by profits in the two previous months so that a $15,000 "average" profit would be attained that month. More important, the consecutive loss provision would permit losses in June and July, while even Scientific would concede that under the amendment the $15,000 "average" profit level must have been attained by the end of June.

The most that can be said about all this is that Scientific raised an issue of ambiguity which required the judge to admit parol evidence and submit the issue to the jury. *See* Meyers v. Selznick Co., 373 F.2d 218 (2 Cir. 1966). That was exactly what Judge Bonsal did. There was ample basis for the jury's upholding Plessey's construction.

Scientific's two other claims—that Plessey did not continue ISL's business in good faith during the measuring year and that it had never intended to do so—raised factual issues on which conflicting evidence required submission to the jury. Since this was done with instructions not claimed to have been erroneous and since there was substantial evidence to support the verdict, we must let it stand.

## V. Plessey's Counterclaim

In support of its counterclaim Plessey adduced testimony by a partner of Price Waterhouse & Co. that ISL's December 31, 1969 balance sheet understated its liabilities in the form of accounts payable by $33,822 and overvalued inventory by $72,930.[7] The principal item in the overvaluation of inventory was $58,500 attributable to 11,700,000 nonexistent memory cores. Plessey contends there was no evidence sufficient to justify the adverse verdict.

---

**7.** The injury arising from these alleged misrepresentations admittedly is reduced since the financial statement also contained $54,000

of accounts payable which had, in fact, been paid.

We do not reach the merits. Plessey never moved for a directed verdict, for judgment n. o. v., or for a new trial with respect to the counterclaim. A contention that there was insufficient evidence to warrant submission to the jury or that the verdict was against the weight of the evidence cannot be raised for the first time on appeal. 5A Moore, Federal Practice ¶ 50.03 [2] at 2334; 6A *id.* ¶ 59.-15 [1] at 265. Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814 (2 Cir. 1970), on which Plessey relies, held only that while failure to move for a directed verdict precludes the grant of a motion for judgment n. o. v., for reasons well stated in 5 Moore, Federal Practice ¶ 50.08 at 2359, it does not prevent a reversal and remand for a new trial when the district court has committed "a plain abuse of discretion," United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 247, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), in denying such a motion. Since Plessey made no motion for that relief, we have no occasion to consider whether its denial would have met the strict standard of *Oliveras.*

### VI. *Costs*

■ Citing Srybnik v. Epstein, 230 F.2d 683 (2 Cir. 1956), and other cases, Scientific claims the district court erred in awarding costs against it, since Plessey, having lost on its counterclaim, was not "the prevailing party" within Fed.R. Civ.P. 54(d). This would be too wooden a view. At trial Plessey limited its counterclaim to the two items mentioned in Part V of this opinion. Little trial time was spent on the counterclaim, whereas consideration of plaintiff's claim for $1,260,000 compensatory damages plus punitive damages required three weeks of trial, 16 witnesses, over 1,800 pages of testimony and more than 100 exhibits. District courts have held that a defendant who successfully fends off a large claim may be awarded costs despite failure to prevail on a counterclaim. *E. g.,* B.B. Chemical Co. v. Cataract Chemical Co., Inc., 2 F.R.D. 159 (W.D.N.Y.), modified on other grounds,

122 F.2d 526 (2 Cir. 1941). *Cf.* Ryan v. Arabian American Oil Co., 18 F.R.D. 206 (S.D.N.Y.1955); Berg v. Wall Street Traders, Inc., 46 F.R.D. 47 (S.D.N.Y. 1968) (mem.). *See also* 6 Moore, Federal Practice ¶ 54.70, at 1305–06 (2d ed. 1974). Judge Bonsal properly exercised his discretion in not denying costs to Plessey because of the judgment against it on its counterclaim.

■ Plessey complains that in his award of costs with respect to the expense of bringing essential witnesses to New York from Barbados and other places, the district judge erred in endorsing the clerk's mechanical application of the "100-mile" rule.[8] It is now clear the the court had power to allow more, Farmer v. Arabian American Oil Co., 379 U.S. 227, 232, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964), and Plessey cites a number of cases, both before and after *Farmer,* where district judges have done this in circumstances apparently no more appealing than here. Maresco v. Flota Mercante Grancolombiana, S.A., 167 F.Supp. 845 (E.D.N.Y.1958) (travel expenses of two witnesses from Bogota, Colombia and from Portland, Oregon); Bank of America v. Loew's International Corp., 163 F.Supp. 924, 928–929 (S.D.N.Y.1958) (travel expenses of three witnesses from England); Dunn v. Merrill Lynch, Pierce, Fenner & Smith Inc., 279 F.Supp. 937 (S.D.N.Y.1968) (travel expenses of two witnesses, ordered by the court to be brought from France); Oscar Gruss & Son v. Lumbermens Mutual Casualty Co., 46 F.R.D. 635 (S.D.N.Y. 1969) (travel expenses of two witnesses, whose testimony was "indispensable", from Zurich); Electronic Specialty Co. v. International Controls Corp., 47 F.R.D. 158 (S.D.N.Y.), modified on other grounds, 409 F.2d 937 (2 Cir. 1969) (travel expenses of two witnesses, one from California). *See also* Moylan v. AMF Overseas Corp. S.A., 354 F.2d 825, 830 (9 Cir. 1965) (award of travel expenses of material witness from Guam within district court's discretion); 10 Wright & Miller, Federal Practice & Procedure, § 2678, at 231–34 (1971). *But cf.* Grogan

---

8. Applying the rule, the clerk of the district court reduced the defendant's requested travel expenses for witnesses from $4,383.38 to $1,563.40.

v. United States, 341 F.2d 39, 43 (6 Cir. 1965) (discretion of district court to allow costs of bringing witnesses from points more than 100 miles from hearing is not as broad as in many other areas). On the other hand, in Arico v. Cie. de Navegacion Transoceanique, 409 F.2d 1002, 1004 (2 Cir. 1969), the district court would not allow the costs incurred by the prevailing party in bringing a material witness from Europe and we refused to interfere, pronouncing the usual litany that the "allowance of expenses is discretionary." While it undoubtedly is, something could surely be said in favor of promulgating more definite standards to channel discretion with respect to the so-called 100-mile rule, either by appellate decision or by rules, thereby assisting district judges to avoid disparity and making possible more meaningful appellate decisions whether discretion had been "abused". Pending such action, which we do not feel inclined to take on the rather slender record and briefing here, it would be helpful if, in close cases, district judges would indicate, if only summarily, why they were or were not applying the 100-mile rule.

Judgment affirmed.